### UNITED TEXTILE WORKERS OF AMERICA, AFL–CIO, Plaintiff-Appellee,

### v.

### TEXTILE WORKERS UNION OF AMERICA, Defendant-Appellant.

### No. 12323.

United States Court of Appeals
Seventh Circuit.

Aug. 11, 1958.

Rehearing Denied Sept. 24, 1958.

Irving M. Friedman, Chicago, Ill., Harold A. Katz, Jerome Schur, S. I. Hirsh, Chicago, Ill., Katz & Friedman, Chicago, Ill., of counsel, for appellant.

Mozart G. Ratner, Chicago, Ill., Jacobs & Ratner, Chicago, Ill., for appellee.

Before FINNEGAN, SCHNACKENBERG and PARKINSON, Circuit Judges.

FINNEGAN, Circuit Judge.

Two labor unions, plaintiff and defendant, entered a private "No-Raiding Agreement" [1] so-called and when the de-

1. Several of the relevant provisions in this Agreement are:

"2. The American Federation of Labor and each union signatory hereto affiliated with it, and each of them, agrees that neither it nor any of its locals will, directly or indirectly, (a) organize or represent or attempt to organize or represent employes as to whom an established bargaining relationship exists with the Congress of Industrial Organizations or with any union which is signatory hereto affiliated with the Congress of Industrial Organizations including any of the locals of such union; (b) seek to represent, or obtain the right to represent, such employes or to disrupt the established bargaining relationship; * *

"3. The Congress of Industrial Organizations and each union signatory hereto affiliated with it, and each of them, agrees that neither it nor any of its locals will, directly or indirectly, (a)

fendant labor organization refused to honor its side of this peace treaty, plaintiff asked the District Court for and obtained coercive measures, which were embodied in the following temporary order, here on review, based on findings of fact and conclusions of law, and: "directing defendant, its agents and representatives and any persons acting in concert with them, pending the final determination of this action or until further order of this Court to immediately request the withdrawal of the representation petition filed by defendant in the matter of Personal Products Corporation, NLRB Case No. 13-RC-5738 and perform all acts necessary on its part to perfect an effective withdrawal of said representation petition and dismissal of the said representation pro

organize or represent or attempt to organize or represent employes as to whom an established bargaining relationship exists with the American Federation of Labor (including any of the locals of such union); (b) seek to represent, or obtain the right to represent, such employes or to disrupt the established bargaining relationship; * * *

"5. Each of the parties hereto agrees to settle all disputes which may arise in connection with this Agreement in accordance with the following procedure:

"(a) Any union a party hereto which claims that any other union a party hereto (including any local of such a union) which is affiliated with the other federation has violated the provisions of this Agreement shall immediately notify in writing the representative of the union complained against, designated in accordance with paragraph 4 of this Agreement, and shall also notify the Secretary-Treasurer of the federation with which that union is affiliated.

"(b) The authorized representatives of the unions involved shall make every effort to settle the dispute.

"(c) In the event the dispute is not settled within 15 days after the mailing of the notification provided for in paragraph (a), the Secretary-Treasurer of the federations, or their designated representatives, shall meet to attempt to achieve compliance with this Agreement.

"(d) In the event that the authorized representatives of the unions involved are unable to settle the dispute within 15 days after the mailing of the notification provided for in paragraph (a), either union or the Secretary-Treasurer of either federation may, not earlier than five days thereafter, submit the dispute to the Imparital Umpire herein provided for.

"(e) In any dispute submitted to him in accordance with the provisions of this paragraph, the Impartial Umpire shall have jurisdiction only to determine whether the acts complained of constitute a violation of this Agreement. * *

"6. The parties hereto agree that the Impartial Umpire under this Agreement shall be jointly appointed by the President of the Congress of Industrial Organizations and the President of the American Federation of Labor. The Impartial Umpire shall decide any case referred to him within 30 days unless an extension of time is agreed to by the parties to the dispute or is requested by the Umpire and agreed to by the parties. The decision of the Impartial Umpire in any case referred or submitted to him under the terms of this Agreement shall be final and binding.

"7. Each of the parties signatory hereto agrees that, in any case in which it is found that it, or any of its locals, has violated the provisions of this Agreement, it will cease such violation and will not, directly or indirectly during the term of this Agreement, represent or seek to represent the employes involved, and that it will, in addition, take the following remedial action upon request of the complaining union:

"(a) Any petition for representation rights filed with the National Labor Relations Board, or any other appropriate federal or state agency, will be immediately withdrawn.

"(b) Any claims for recognition which may have been submitted to the employer will be withdrawn immediately.

"8. Each union signatory hereto agrees to be bound by the provisions of this Agreement with respect only to such unions affiliated with the other federation as are then signatory hereto or which may thereafter become signatory hereto. The parties further agree that any party to this Agreement to whom they are so bound shall have the right to institute such actions or proceedings as may be necessary to compel compliance with the terms of this Agreement only after exhausting all of the steps provided herein."

ceeding, and to conform in all respects to the arbitration award of David L. Cole dated March 25, 1958."

Various facts, which so far as concern present issues follow. Both parties are labor organizations within the meaning of § 2(5), National Labor Relations Act, 61 Stat. 137, 29 U.S.C.A. § 152, and § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185. The district judge found that the activities of these Unions affect commerce within the meaning of the Labor Management Relations Act.

In the spring of 1953, a committee composed of representatives of the two rival federations, AFL and CIO met for the purpose of attempting to eliminate various obstacles to unification, paving the way for merger. "The committee gave particular consideration to the problem of 'raiding' between the federations —attempts by unions affiliated with one of the federations to organize and represent employees as to whom a union affiliated with the other federation was already recognized or certified as the collective bargaining representative. It was unanimously agreed that the elimination of raiding constituted a necessary first condition to the achievement of unity." The committee reported to the respective federations that: "The results of the study made by the subcommittee, as well as the experience and knowledge of the members of the full committee, compel the conclusion that 'raids' between A. F. of L. and C. I. O. unions are destructive of the best interests of the unions immediately involved and also of the entire trade union movement. In addition to the antagonisms between unions created by such raids, the welfare of the workers and the public is damaged. The overwhelming majority of such attempted raids fail, creating unrest, dissatisfaction and disunity among the workers involved. Even in the small proportion of cases where such attempts are successful they involve a drain of time and money far disproportionate to the number of employees involved. They create industrial strain and conflict and they do nothing to add to the strength and capabilities of the trade union movement as a whole.

"There are still millions of working men and women who do not have the benefit of organizations or collective bargaining. The members of all unions affiliated with both federations would be benefited if the energies devoted to raiding were devoted to the organization of those yet unorganized." The committee concluded that "elimination of raiding * * * would contribute to the strength of the unions affiliated with both federations, would materially benefit the entire nation by eliminating a source of industrial unrest and conflict and would remove a serious barrier to ultimate organic unity between the two federations." The committee therefore recommended that both federations should adopt "as a fundamental policy" the principle that "no unions affiliated with either federation shall attempt to organize or represent employees as to whom an established bargaining relationship exists between their employer and a union in the other federation"; that this fundamental policy should be incorporated into an agreement, and that "Each federation should urge that its affiliated unions subscribe and becoming [sic] parties to this 'No-Raiding Agreement' ".

Emphasizing that the proposed No-Raiding Agreement "would be binding upon national and international unions only upon signing this Agreement, and will then become applicable to all local affiliates of such national and international unions"; that the Agreement is "the first and indispensable step toward achievement of organic unity" and that "its adoption would be in the public interest and to the benefit of our entire country," the Resolutions Committee recommended, and the 1953 Convention of the AFL approved the Agreement.

Following formal signing of the Agreement by 65 unions affiliated with the AFL, including plaintiff-appellee, and 29 affiliated with the CIO, including defendant-appellant the joint AFL–CIO

Unity Committee, on June 9, 1954, issued a public statement declaring that "the signatory unions will gain substantial benefits from the cessation of hostilities" and that the committee anticipates that "virtually every union involved in jurisdictional strife will come in within a reasonable time." The statement concluded (*ibid*): "We have a solemn duty to organize the unorganized, instead of raiding each other's members. The signing of the No-Raiding Agreement today will permit us to concentrate our energy and our effort on the basic trade union goal."

Under the No-Raiding Agreement, each signatory agrees in substance, that it will not "organize or attempt to organize," "seek to represent, or obtain the right to represent" employees as to whom "an established bargaining relationship exists" between a signatory union affiliated with the other federation or any of its local affiliates and the employer of such employees. Each signatory further agrees not to "disrupt" any such "established bargaining relationship." "Established bargaining relationship" is defined as a situation in which "a union or a local" either "has been recognized by the employer * * * as the collective bargaining representative for the employees involved for a period of one year or more, or is certified by the National Labor Relations Board, or other Federal or State Agency having jurisdiction, as the collective bargaining representative for the employees."

The Agreement provides that each of the parties agrees to settle all disputes which may arise in connection with this Agreement in accordance with arbitration procedure.

Plaintiff and defendant are international unions, each primarily engaged in representing employees in collective bargaining in the textile industry. Each is affiliated with the AFL–CIO. On July 29, 1957, President Meany of the AFL–CIO requested the Ethical Practices Committee of the AFL–CIO to investigate the affairs of the plaintiff. On September 16, 1957, the Ethical Prac-

tices Committee issued its report setting forth certain findings concerning practices engaged in by the plaintiff, and concluding that the plaintiff "does not meet the standards for ethical union practices set forth in the AFL–CIO Constitution." On September 24, 1957, the Executive Council of the AFL–CIO after consideration of the report of the Ethical Practices Committee, issued its report adopting the report of the Ethical Practices Committee and concluded that the plaintiff "is dominated, controlled or substantially influenced in the conduct of its affairs by corrupt influences in violation of the Constitution of the AFL–CIO;" and directed certain action to be taken by the plaintiff to remedy the situation.

On October 2, 1957, the defendant filed a petition with the National Labor Relations Board requesting a certification election among the employees of the Personal Products Corporation. This petition recited that it was supported by 30% or more of the employees in the bargaining unit. Prior to that date, Local 444, a local affiliated with plaintiff, had been recognized by the Company and had a collective bargaining agreement with it. On October 25, 1957, the Executive Council of the AFL–CIO issued its resolution declaring in substance that the Executive Council found that the plaintiff had not taken the remedial steps required of it and directed suspension of plaintiff from the AFL–CIO as of November 15, 1957, unless prior to that date plaintiff took the specified remedial action. On December 4, 1957, the AFL–CIO suspended the plaintiff. A week later the plaintiff was restored to good standing following certain action and agreements by the plaintiff, including its agreement to permit continued auditing of its accounts under the supervision of the AFL–CIO and its agreement to make certain periodic reports. Prior to the suspension of the plaintiff, it had been the subject of the investigation and had appeared in hearings before the Select Committee on Improper Activities in the labor or management field, United States Senate, commonly referred to as

the McClellan Committee. The report of the McClellan Committee, and reports of the Ethical Practices Committee and the Executive Council of the AFL–CIO were before the Court below.

On October 25, 1957, after defendant had filed the petition with the Board, Local 444, United Textile Workers of America, entered into a new collective bargaining agreement with Personal Products Corporation covering all of that Company's employees, which by its terms is effective until December 12, 1960. Plaintiff itself is not a party to that agreement. The agreement recognizes Local 444 as the exclusive representative of the Company's employees for purposes of collective bargaining; provides for a checkoff of union dues and initiation fees; it provides for membership in the union as a condition of employment and appears to be a renewal or extension of a prior contract entered into in July of 1956.

Plaintiff and the defendant were both signatories to the No-Raiding Agreement, which was extended from its original expiration date until December 31, 1957, when it expired. Defendant did not renew its signature after the expiration. A hearing was held January 22, 1958 before David L. Cole, impartial umpire appointed under the No-Raiding Agreement, after the expiration of the term of the agreement. Earlier, on December 16, 1957, the Board had conducted its hearing on defendant's petition. On March 25, 1958, Cole issued his decision, stating, inter alia that the defendant by organizing the employees of the Company, and by filing the Petition with the NLRB requesting certification as the employees' collective bargaining agent, had committed acts constituting a violation of the No-Raiding Agreement. Plaintiff filed a motion to reopen the record in the Board proceeding, bringing before the Board Cole's decision and asking the Board to dismiss the petition because of that award. On April 11, 1958 the plaintiff requested AFL–CIO, President Meany to take steps to enforce Cole's determination, and he had not act-

ed on plaintiff's request up to the time plaintiff filed its complaint, below, on April 21, 1958. The Board issued its decision on April 16, 1958, and directed that an election be held among the employees of Personal Products Corporation; specifically rejecting the contentions raised regarding the effect of the No-Raiding Agreement and of Cole's decision. Among its findings the Board stated that the employer was engaged in commerce within the meaning of the Act; that a question affecting commerce existed concerning the representation of the employees, within the meaning of the Act. The only parties to the proceeding were the defendant as petitioner and Local 444, UTW, as intervenor on the basis of its contract with the employer. Plaintiff did not intervene in the Board proceeding in its own name.

Section 301 of the National Labor Relations Act, 61 Stat. 156, 29 U.S.C.A. § 185, provides in part relevant here:

"(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this Act and any employer whose activities affect commerce as defined in this Act shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against

any individual member or his assets." (Emphasis supplied).

All the Umpire[2] could possibly do under clause 5(e), of the No-Raiding Agreement, was decide if a contracting Union violated the Agreement and, if he declared such a violation existed then the offending Union is bound to take action pursuant to clause 5. In the case before us plaintiff invokes § 301 of the Act to compel obedience by the defendant of clause 5. Two cases, Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp., 1955, 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510, and Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972, show the ambiguities and inadequacies found in § 301. See e. g. Local No. 149, etc. v. General Electric Company, 1 Cir., 1957, 250 F.2d 922, Engineers Ass'n v. Sperry Gyroscope Co., etc., 2 Cir., 1957, 251 F.2d 133. Legislative history of § 301 is obscure and little help in our search for an answer to the question whether Congress intended to give unions such status that they could sue, and respond in a district court, in an inter-union piece of litigation. We think the language in § 301 makes it clear that collective bargaining contracts were the prime subject of § 301, whatever fragments, if any, of legislative history are found.

Subsection (b) of § 301 provides in simple language: "Any such labor organization may sue or be sued as an *entity*, and in *behalf* of the employees whom it represents in the courts of the United States." (Italics supplied.) Indeed the entire collective bargaining process envisages, and requires, a union to be the representative unit for its members. We think the agreement, now on review, is a labor peace treaty enforceable under § 301 by the plaintiff union for its members.

Certainly the line, "between any such labor organizations," embedded in § 301, manifests Congressional recognition of contracts between unions as being the subject of enforcement in federal courts. Textile Workers opinion, *infra*, dispels any doubts about the existence of federal rights under § 301, and we cannot dilute that holding by cutting ground from under the judgment given after litigation between two unions bound under a contract. These parties are both labor organizations within the meaning of § 301. See Sutherland Statutory Construction, § 4705 (3rd ed.).

One of the central findings of facts made by the district judge lays bare the core of the practical situation before us: "Unless defendant is ordered to withdraw its petition, the National Labor Relations Board will, pursuant to its decision issued April 16, 1958, in Case No. 13–RC–5738, conduct a representative election on . . . (defendant's) petition among the employees of Personal Products Corporation and the plaintiff will thereby be irreparably injured and its rights under the Agreement will be frustrated and denied." There is nothing in this record showing duress or coercion exerted on the defendant Union to induce it to become a party to the Agreement it now anxiously seeks to repudiate.

We think it quite clear that the defendant union engaged in a course of activity designed to disrupt plaintiff's established bargaining relationship with Personal Products Corporation at its Chicago plant. David L. Cole, the impartial umpire found this to be the situation and defendant, apparently, does not seriously controvert the fact. Of course the Umpire's function is "to decide whether the acts complained of constitute a violation of the Agreement, and this the Umpire must do irrespective of whether there are adequate or effective

2. On March 25, 1958, David L. Cole issued his decision holding that:
  "TWUA in organizing the employees of Personal Products Corporation at its Chicago plant, and in filing a petition with the NLRB on October 2, 1957, requesting that it be certified as the representative of these employees for collective bargaining purposes has committed acts which constitute a violation of the No-Raiding Agreement."

remedies to follow." If we struck down § 301 the aim of the "No-Raiding" agreement would be nullified and it would be the same old familiar story where men enter agreements one party to which either knows in advance, or later seeks to escape because, there is no enforcing apparatus. Apparently Congress realized that without coercive measures placed in the hands of parties to agreements, the paper bearing empty words becomes a useless thing. Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed. 2d 972, manifests such an awareness, though we frankly state the opinion repeatedly refers to "collective bargaining contracts," and does represent views of a divided Court. Yet much of the majority reasoning in that opinion is helpful even though we are faced with an inter-union contract piece of litigation.

In Textile Workers Union of America v. Lincoln Mills, 1957, 353 U.S. 448, 77 S.Ct. 912, 914, 1 L.Ed.2d 972, the petitioning union entered into a collective bargaining agreement with the respondent-employer. The last step in the grievance procedure, provided for in that contract, was arbitration, and when the employer rejected the union's request for arbitration, the latter brought suit under § 301 in the district court to compel arbitration. That Court concluded it had jurisdiction and ordered the employer to comply with the grievance arbitration provisions of the collective bargaining agreement. "The Court of Appeals reversed by a divided vote * * *. It held that, although the District Court had jurisdiction to entertain the suit, the court had no authority founded either in federal or state law to grant the relief." On review, the Fifth Circuit's decision was reversed by the Supreme Court.

Delivering the majority opinion, in Textile Workers Union of America v. Lincoln Mills, Mr. Justice Douglas wrote: " * * * [T]he agreement to arbitrate grievance disputes, contained in this collective bargaining agreement, should be specifically enforced.

"From the face of the Act it is apparent that § 301(a) and § 301(b) supplement one another. Section 301(b) makes it possible for a labor organization, representing employees in an industry affecting commerce, to sue and be sued as an entity in the federal courts. Section 301(b) in other words provides the procedural remedy lacking at common law. Section 301(a) certainly does something more than that. Plainly, it supplies the basis upon which the federal district courts may take jurisdiction and apply the procedural rule of § 301(b). The question is whether § 301(a) is more than jurisdictional * * *.

"Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way.

* * * * * *

"The question then is, what is the substantive law to be applied in suits under § 301(a)? We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from our policy of our national labor laws." Certainly Textile Workers Union of America v. Lincoln Mills, supra, lays to rest problems of enforcing arbitration clauses. See e. g. Textile Workers Union v. American Thread Co., D.C.Mass.1953, 113 F.Supp. 137.

The defendant Union is urging that despite its contractual commitment with plaintiff Union, it is free to raid and capture members belonging to plaintiff, because federal courts are without jurisdiction to compel obedience to Non-Raiding contracts. We disagree.

A division of judges of this Court entered an order, May 7, 1958, providing:

"that the execution of the order of the District Court (entered May 5, 1958) * * * be and it is hereby stayed until the further order of this court." That stay is vacated and the judgment order appealed, is affirmed.

Judgment affirmed.