DEERING–MILLIKEN & CO., Inc., a corporation, Appellant,

v.

MODERN–AIRE OF HOLLYWOOD, Inc., a corporation, Appellee.

No. 14481.

United States Court of Appeals Ninth Circuit.

Nov. 16, 1955.

Rehearing Denied April 20, 1956.

Adams, Duque & Hazeltine, James S. Cline, Lawrence T. Lydick, Los Angeles, Cal., for appellant.

Aaron L. Lincoff, Gilbert Klein, Los Angeles, Cal., for appellee.

Before STEPHENS and FEE, Circuit Judges, and WIIG, District Judge.

JAMES ALGER FEE, Circuit Judge.

This is an action on alleged contract claimed to have been entered into between Modern-Aire of Hollywood, Inc., plaintiff, and Deering-Milliken & Co., Inc., defendant. The complaint alleges the formation and breach by Deering-Milliken of a contract with plaintiff for the purchase and sale of 126,000 yards of rayon goods. The supposed agreement concerned material to be used by Modern-Aire in filling another engagement entered into by that company with the United States. The cause was tried by a judge sitting without a jury. Judgment was for plaintiff Modern-Aire and appeal followed.

Modern-Aire has been manufacturing finished textile products for some years. Its representative in the instant transaction was its president and sole owner, Leonard Mills. Deering-Milliken is a national sales agency for certain textile mills.

In 1951, Mills was negotiating with the Army for the manufacture of a large quantity of inner assembly liners for cartridge cases. The Army specifications were detailed, as might be expected, and covered general specifications, requirements, sampling, inspection and test procedures. In pursuance of his plan to obtain a government contract, Mills inquired of defendant for a price quotation on rayon cloth. There were innumerable negotiations both between

plaintiff and defendant and plaintiff and the Army. These were gone into in great detail in the evidence. There were two letters which resulted from these confused bargainings, both dated March 6, 1952.

Exhibit 6 was a letter by the Regional Manager of Deering-Milliken, defendant, to Modern-Aire, attention Mr. Mills. The text is as follows:

"We understand from our conversation today in this office that we have consummated a contract with you for 101,200 yards of 45½" rayon cartridge cloth in the greige as per government specification PXS-1300 and also for 23,900 yards of the same material in 47½" width. These goods are to be furnished to you on terms of net 30 days, f. o. b. our mill, delivery on both items to start the week ending April 25th. We hope to be able to arrange the shipment of these goods to completion one-sixth of each width every two weeks. We understand your contract with the government on which these goods are to be used contains a 90% partial payment clause.

"This memo is written with the idea of submitting it to the Government Procurement Office."

The second letter was marked Exhibit 7 and was sent by defendant to plaintiff in the same manner as the previous exhibit. Its text is as follows:

"This will confirm our quotation to you of today on 101,200 yards of 45½" rayon cartridge cloth in the greige as per Specification PXS-1300 at 36⅛¢ per yard and 23,900 yards of the same material in 47½" width in the greige at 37⅜¢ per yard, both on terms of net 30 days,

delivery to start in April and spread out to completion.

"We are teletyping your order for these goods to our home office tonight subject to your receipt of the contract from the government; and, of course, the whole thing is predicated on our ability to handle the business when you are in a position to confirm it."

Based upon the two exhibits above quoted, the trial court entered a finding as follows:

"The Court finds that said contract in writing made and executed as aforesaid on or about the 6th day of March, 1952, consists of two letters written by the defendant to the plaintiff, which said two letters are in evidence as plaintiff's Exhibits 6 and 7."

This finding that these two letters constitute a written contract amounts to a legal construction of the writings. It is not a true finding. The interpretation of formal writings has been traditionally a function of the court. The rule does not include the interpretation of depositions or writings which are a part of a transaction where oral expressions also enter the finding. In determining the question of whether these letters state a contract, this Court is bound by the rules of substantive law of California. Thus viewed, the construction of these writings was clearly erroneous.[1]

There were three reasons for the failure of these writings to evidence a contract:

(1) The two writings do not clearly indicate all the terms of the supposed agreement. The parties continued in negotiation until March 20, trying to work

[1] "* * * in order to constitute a valid contract, the minds of the contracting parties must meet, and agree to the same thing. 'It is essential to the validity of a contract that the parties should have consented to the same subject-matter, in the same sense. They must have contracted ad idem.' Utley v. Donaldson, 94 U.S. [29], 48." Breckinridge v. Crocker, 78 Cal. 529, 536, 21 P. 179, 181. "The due execution of a contract requires the assent of at least two minds to each and all of the essentials of the agreement." Jules Levy & Bros. v. A. Mautz & Co., 16 Cal.App. 666, 670, 117 P. 936, 938. See also Blake v. Mosher, 11 Cal.App.2d 532, 54 P.2d 492.

out terms and details. Defendant finally broke off negotiations.

(2) There is a vital and irreconcilable conflict contained in the phrase "rayon cartridge cloth in the greige as per government specification PXS-1300." "In the greige" has a technical meaning explained in the evidence. It means "natural" or "unbleached" goods. It refers to cloth in its natural state as it comes off the loom. The government specification called for finished goods ready to manufacture into the articles specified in the government contract. This phrase was differently understood by the respective parties. The minds did not meet. Both would have been bound if the phrase had a meaning. But it was apparently inexplicable and unintelligible as it read. This was the exact point upon which the litigants parted company. Defendant indicated that the cost of bringing goods "in the greige" up to the specification would be 3¢ per yard. Plaintiff seems to contend that the words "in the greige" should be given no meaning and that the goods attempted to be contracted for must meet government specifications when delivered to plaintiff. In all probability, the reason plaintiff obtained a government contract was because its bid was founded on this belief and thus was lower than it would have been if the words "in the greige" had been given the meaning defendant assigns to them.

(3) The first letter of March 6 contains no prices. It cannot be a contract alone. This was written, according to its terms, for submission to the Government Procurement Office. The second letter contains the significant phrase "predicated on our ability to handle the business when you are in a position to confirm it." These two letters did not arise beyond the level of negotiation. Obviously, many other terms were in contemplation before consummation.

Some time between March 12 and March 14, Mills received and signed his contract with the United States. Thereafter, one Piersol, manager of the Los Angeles office of defendant, pursuant to Mills' instructions, prepared a memorandum of order, Exhibit 8, as follows:

"Deering, Milliken & Co., Inc.
"LA361    Memorandum of Order
Los Angeles Sales Office
111 West Seventh Street
Los Angeles, Cal.
Modern-Aire of Hollywood, Inc.
3–14–52
1112 Sentous
Los Angeles, California
Mr. Piersol
1/6 every two weeks starting with earliest possible date but not later than April 18th—earlier if possible—very important above

Earliest possible Arrow Line sailing from Charleston, S. C., starting time to be not later than April 18th—earlier if possible

~~38–1/8¢~~        Net 30 days—
36–1/8¢        10% deposit with
contract

126,000 yards 45½" minimum width PXS-1300
Each Shipment To Contain Not More Than 5% Seconds—Goods Shipped in Bales
A—Are goods taken on this order for Government use? Yes..✓.. No......
B—If "No" is checked, state basis of information (phone, letter, personal call) ....................

This order is subject to acceptance or rejection by our mill.

This order is subject to the provisions of our Salesnote."

A copy of this order was sent to New York, apparently so that a formal "Salesnote" might be prepared if the order was accepted by the mill involved. Mills also received a copy of this order. No salesnote was ever drawn, and about March 21 defendant took the position that there was no contract.

The court, without regard to these circumstances, made a finding as to the effect of this document. This "finding" reads:

"The Court finds that plaintiff's Exhibit 8 in evidence designated Memorandum of Order, was prepared by the defendant in accord-

ance with the defendant's business custom, practice and usage, and was prepared by the defendant for the purpose of confirming the fact that a contract had been entered into on or about March 6, 1952, by and between the plaintiff and defendant, and for the further purpose of confirming certain terms and conditions contained in the contract made on or about March 6, 1952."

The order of March 14 is treated in the finding above as a confirmation and modification of an existing contract made by the two letters of March 6. Since there was no contract upon March 6, as indicated above, there could be no confirmation thereof unless all three documents constituted a contract entered into upon March 14. Exhibit 8, set out above, is subject to the same vice as the previous communications. The two significant phrases at the bottom indicate that negotiations were still to be pursued. In fact, negotiations were pursued and continued until March 20. The conclusion that any or all of these three documents evidenced or constituted a contract cannot stand.

■ There were many other findings of fact relating to the negotiations which plaintiff contends estop defendant from asserting there was not a contract. Either a contract came in existence or it did not. A contract cannot be formed by estoppel.[2]

■ This Court is impressed, as was the trial judge, that the attitude of defendant was, to say the least, not entirely disingenuous. There was considerable evidence in the record from which there is a possibility a contract, partially in writing and partially oral, might be spelled out. But this would require findings of fact as to intention, consideration, and definiteness. It is not within the competence of this Court to make such findings even if it were possible upon the record here, a point upon which no opinion is expressed.

■■ The cause must be remanded in any event for other reasons:

(1) There is no sufficient basis in the present record for allowing damages for anticipated profits to plaintiff. This was a new enterprise engaging in a new industry. It is well established that there is no foundation for allowance of damages for loss of profits under such circumstances. If there had been previous experience at a profit over a period of time, then a reasonable calculation could be made. Nor does this situation fall within the rule that, when a chattel is contracted for at a price materially below the price in a contract for resale, the difference is recoverable. Here a manufacturing job was necessary before the goods could be delivered to the government. It is common knowledge that, in such operation, there is not only no guaranty of profit, but that loss can be avoided only by the acumen, skill and economy of the operation.

■ (2) The government was not a party to the action. The pertinent portions of the judgment entered by the trial court follow:

"It is Ordered, Adjudged and Decreed that plaintiff, Modern-Aire of Hollywood, Inc., a California corporation, do have and recover of and from the defendant, Deering-Milliken & Co., Inc., a New York corporation, damages in the sum of $8,-522.26, with interest thereon at the rate of seven per cent (7%) per annum from the 25th day of March, 1952.

"It is Further Ordered, Adjudged and Decreed that from said amount the sum of $4,100.66 be held by the plaintiff as trust monies for the use and benefit of the United States of America and immediately upon re-

2. " * * * since the contract was unenforceable against appellants because of its uncertainty * * * and could have been repudiated by them, they cannot urge that respondents were estopped because of their attempted compliance with its terms." Toms v. Hellman, 115 Cal. App. 74, 84, 1 P.2d 31, 35.

ceipt by plaintiff be remitted to the United States."

There was no justification or jurisdiction for the direction to hold monies in trust for the United States. Since the first paragraph of the judgment is based in part upon these monies which are to be held in trust, it must be set aside also. There was no evidence upon which to base any such finding. The United States had not recovered anything against plaintiff. It is said improperly outside the record that a suit has been filed by the United States against Modern-Aire, while this case has been on appeal. However that may be, recovery by the government is a remote possibility. Any finding in this case based upon a possibility is premature. It is entirely improper to prejudge the outcome of the government's suit and assess the damages against defendant. Furthermore, there is no basis in this record to sustain the finding of any damage in this regard.

Reversed and remanded.