Glen COOK, Libelant,

v.

THE MV WASABORG, her engines, tackle and gear, and any and all persons claiming any interest therein, and Stockholms Red, A/B Svea, owner and operator, and O. Wallenius Stockholm, charterer, Respondents.

STOCKHOLMS REDERIAKTIEBOLAG, SVEA, Claimant,

v.

BRADY–HAMILTON STEVEDORE COMPANY, Third-Party Respondent.

Civ. No. 411–59.

United States District Court
D. Oregon.

Nov. 4, 1960.

Pozzi & Wilson; Frank Pozzi, Portland, Or., for libelant.

Wood, Matthiessen, Wood & Tatum; Gray & Lister; H. Lawrence Lister; Nathan J. Heath, Portland, Or., for respondent.

KILKENNY, District Judge.

Libel in personam and in rem with foreign attachment for damages resulting and injuries received by libelant to his person as a result of the alleged unseaworthiness of the vessel [1] and the negligence of the respondent-claimant, Stockholms Rederiaktiebolag, Svea,[2] and re- spondent O. Wallenius Stockholm,[3] the time charterer of the vessel. Brady-Hamilton Stevedore Company [4] was joined as a third party respondent on the motion of Stockholms.

On October 2, 1959, the vessel was lying on navigable waters in the Columbia River and at that time and place the owner and operator was Stockholms. Libelant, together with other longshoremen, was employed by Brady to work on the vessel and, while so employed, was injured. At that time and place Brady was acting as master stevedore and was performing all of the stevedore work aboard the vessel pursuant to agreement with charterer. Said contract contained no express agreement of indemnity. At said time the vessel was in the possession of its master and the attachment was made while the vessel was in the master's possession. After the commencement of the suit, Stockholms tendered defense of the cause to Brady, notifying Brady that it would be held liable to Stockholms for any loss or damage, including attorney fees, costs and expenses, incurred by Stockholms in connection with the defense of the suit. Brady refused to accept said defense.

Libelant was a gang boss in charge of a group of longshoremen and while performing his duties on the deck of the vessel, the boom fell and struck certain lumber, which in turn struck the libelant.

I have already held that at said time and place the vessel was unseaworthy and respondents were negligent in the following particulars proximately causing the libelant's injuries;

1. That the drum, pawl bar, ratchet and lift gear used in connection with lifting and lowering the boom on said vessel were rusty, corroded and covered with excess paint so that the mechanism would not operate freely as designed, and such pawl bar would not fall into the ratchet provided therefor, and that said

1. M/V Wasaborg.

2. herein called Stockholms.

3. herein called charterer.

4. herein called Brady.

mechanism was designed as a safety device to prevent the falling of such boom.

2. That the topping lift wire on said boom was old, weak, corroded and rusted to such an extent that it was weak and parted.

Issues to be decided at this time are:

(1) the amount of libelant's damage, general and special;

(2) contributory negligence, if any, of libelant;

(3) right of indemnity, if any, against Brady;

(4) Brady's right of indemnity, if any, against libelant.

■ I. Libelant, 55 years of age, was injured on October 2, 1959 and returned to work on November 10, 1959. He has been working full time, or approximately full time, since then. The most serious injuries of which libelant complains are a consistent pain in his cervical spine and a loss of hearing. My analysis of the testimony of Drs. Kernan and Harrison is that libelant received no permanent injury which can be traced to this occurrence. He has some loss of hearing, but most of this is bilateral, which is entirely due to age. The hearing in one ear is 10% greater than in the other and this might be due to trauma received in the accident. However, the testimony is that such a differential is not unusual in a man of libelant's age. I closely observed the libelant in the courtroom and am of the belief that his hearing will measure up to that of a normal person of his age. Another fact which might indicate that the lack of hearing is not due to the accident is that there is no evidence of complaints to doctors until June 1960. The injury to the neck is difficult of evaluation. It would seem that libelant had some trouble with his neck prior to the accident. I quote from Dr. Harrison's testimony: "I notice there was a statement that he had had some occasional episodes of pain in his neck, with some minor irritation down his arms, prior to

the time of the accident." There is no question that libelant received some rather painful injuries, including injuries to the kidneys and head. I do not believe they were either serious or permanent. I fix the libelant's general damages at $6,500, his medical expenses at $443.50, and his loss of earnings at $675.

■ II. At the time of this accident the libelant was performing his duties as a longshoreman and, insofar as required, performing his duties as gang boss. Rule 206 of the Pacific Coast Marine Safety Code, under which the parties were operating, placed the following duties on a gang boss, such as libelant:

"The safety duties of the hatch, dock, gang, or other group leader, are:

"(a) To be in direct charge of his gang or group and to see that all work is done in a safe manner.

"(b) To report promptly to his foreman or walking boss or other employer representative on the job any defect in the gear or machinery or any unsafe working condition.

"(c) To instruct the men under him in the proper and safe methods of handling cargo, gear, and equipment.

"(d) In the event that he finds it impossible to get in touch immediately with his foreman or walking boss or other employer representative on the job, to himself stop the work upon discovery of any defective gear until his foreman or walking boss or other employer representative on the job shall have had opportunity to pass upon the situation."

From the evidence it is clear that the gang boss works under the hatch tender. Rule 207 of the same Code places the following duties on the hatch tender:

"The safety duties of the person designated as hatch tender or signal man, are:

"(a) To consider himself as the safety man for the gang, and for this purpose to cooperate with his foreman or walking boss or other employer representative on the job for the safety of the men during operations.

"(b) To see that all ship's cargo handling gear is at all times properly secured and in apparent safe working condition and that the space over which he has to travel in following the hook is clear of obstructions.

"(c) To see that the save all is properly made fast.

"(d) To see that hatch beams, or strongbacks and hatch covers which are removed are stowed in a safe, orderly manner.

"(e) To see that strongbacks adjacent to sections through which cargo is to be worked are locked, bolted, or otherwise secured before hoisting operations are started.

"(f) To see that all loads are properly slung before being hoisted.

"(g) To control the movements of sling loads by positive signals to the winch driver.

"(h) To keep the sling load in sight when it is moving and warn all persons in danger of being injured by the movement of cargo.

"(i) To allow sling loads to be hoisted or lowered only when there is no danger of striking a person who is ascending or descending a ladder in his hatch.

"(j) To see that, when it is necessary to hold loads, they are held over or landed on the deck, and not suspended over heads of men working under the hook.

"(k) To enforce the rule that riding cargo hook, or any gear, or load attached thereto, is prohibited except in emergency and then only under the order and direct supervision of his foreman, walking boss or other employer representative.

"(l) To remain on the job until all men in his gang are out of the hold."

Under the testimony in this case and under the safety rules above mentioned, the primary duty to see that the vessel is seaworthy and the gear ship-shape rests with the hatch tender, not with the gang boss. In the present case, Johnson, the hatch tender, readily admits that he was fully aware of the faulty condition of the drum, pawl bar and ratchet prior to the accident. There is no doubt that his failure to report this condition or to remedy it was a primary cause of the accident. There is nothing in the safety rules outlining the duties of the hatch boss which would require him to make an inspection of the ship's gear. It is only after *discovery* of defective gear that the gang boss is required to take action. In this case the libelant had no notice or knowledge, actual or implied, that the ship was unseaworthy or the gear defective.

On the question of contributory negligence, I believe it is of importance that the defective gear was actually furnished by the vessel, rather than by Brady. If Brady had furnished the gear which made the ship unseaworthy, and if libelant was responsible for the inspection of such gear, an entirely different question might be presented. No contributory negligence is shown.

III. We now approach the problem of indemnity by Brady to respondents. A stevedore, such as Brady, has an implied duty to perform its stevedore service in a workmanlike manner and with reasonable safety to persons and property. Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; American President Lines v. Marine Terminals Corp., 9 Cir., 1956, 234 F.2d 753. This statement is qualified in Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491,

in which it is held that the owner of the vessel is entitled to indemnity against the stevedore for liability incurred as a foreseeable result of a substandard performance in the absence of conduct of the owner sufficient to preclude recovery. The mere furnishing of defective equipment by the vessel to the stevedore does not bar recovery on this implied warranty and this warranty is for the benefit of the vessel, irrespective of whether the vessel's owners are parties to the contract. Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413. The factual background in Crumady is similar to ours. The hatch tender of Brady had actual knowledge of the defective pawl bar. By the use of this pawl bar, Brady set in motion the unseaworthy condition of the vessel. American Export Lines v. Revel, 4 Cir., 1959, 266 F.2d 82; Hugev v. Dampskisaktieselskabet International, 9 Cir., 1959, 170 F.Supp. 601, affirmed 9 Cir., 274 F.2d 875; Calmar Steamship Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79.

Brady attempts to avoid the effect of these decisions by claiming that it had a special contract with charterer which contained the following provision:

"*   *   *   that the steamship company will furnish suitable booms, winches, blocks and falls, steam and/or power and lights and will maintain the same in safe and efficient working conditions during the progress of the work."

The form of contract, using this language, was forwarded by Brady to Waterman Steamship Company, as agent for charterer, with a letter dated August 7, 1959. The letter contained a request to use the contract as a memorandum agreement. This contract form was not signed by Brady. The letter contained a further request that Waterman consider these suggestions and confirm its coverage. It is well to keep in mind that Brady had been doing the stevedore work for the charterer for a number of years prior to the date of this letter. No answer was ever received to this letter and the question presented is whether this form of contract was ever accepted by Waterman, the agent for charterer. It is indicated in Hugev v. Dampskisaktieselskabet International, supra, that such a provision in a contract between the stevedore and the proper party might relieve the stevedore of its implied obligation to indemnify the vessel. It will not be necessary for me to pass on this point unless I find that a contract existed.

To create a contract the minds of the parties must meet as to every essential term of the proposed contract and there must be a clear and unequivocal acceptance of a certain and definite offer in order that such offer may become a contract. Joseph v. Donover Co., 9 Cir., 1958, 261 F.2d 813; Deering-Milliken & Co. v. Modern-Aire of Hollywood, Inc., 9 Cir., 1955, 231 F.2d 623.

Oregon follows the same rule. Klussman v. Day, 107 Or. 109, 213 P. 787, rehearing denied 214 P. 348. An offer, to become a contract, must be accepted. Maeder Steel Products Co. v. Zanello, 109 Or. 562, 220 P. 155; Medford Furniture & Hardware Co. v. Hanley, 120 Or. 229, 250 P. 876. A meeting of the minds on each and all of the essential elements is indispensable to the creation of a contractual relationship. Kretz v. Howard, 220 Or. 73, 346 P.2d 93. The same rule exists in California, the place of residence of Waterman. Deering-Milliken & Co. v. Modern-Aire of Hollywood, supra. It is an accepted rule of law that silence and inaction do not amount to an acceptance of an offer. Beach v. United States, 226 U.S. 243, 33 S.Ct. 20, 57 L.Ed. 205; New York Central R. Co. v. The Talisman, 288 U.S. 239, 53 S.Ct. 328, 77 L.Ed. 721. The letter of transmittal required an acceptance by Waterman. In view of the previous relationship of the parties and in the light of the evidence in this case, the subsequent engagement of Brady to work the vessel does not amount to an implied acceptance of the offer. I find that there was

no contract between Brady and the charterer which in any way exonerated Brady from its duty as outlined in the above cases. This conclusion eliminates the necessity of discussing the binding effect of such a contract on the vessel or owner. There is respectable authority holding that such a contract would not be binding. Adams v. The Peter Moran, D.C. S.D.N.Y.1950, 94 F.Supp. 520; States Marine Corporation v. Victory Carriers, Inc., 9 Cir., 1959, 272 F.2d 463; The Niels R. Finsen, D.C.S.D.N.Y.1931, 52 F.2d 795.

Brady is liable to Stockholms, the owner, by way of indemnity for the full amount of libelant's judgment.

IV. Brady argues that libelant was its vice-principal and as such is liable for the full amount of the judgment. In other words, if we would follow Brady's reasoning, we would make a complete circle and end this litigation where we started. Although libelant, as additional third party respondent, has not responded to Brady's pleading, the issue has been framed in the arguments and by the briefs of counsel and I believe it should be decided at this time.

The authorities, Galer v. Weyerhaeuser Timber Co., 218 Or. 152, 344 P.2d 544 (vice-principal); Howard v. Foster & Kleiser, 217 Or. 516, 332 P.2d 621, 243 P.2d 780 (vice-principal); and Walker v. Lykes Bros., 2 Cir., 1951, 193 F.2d 772 (master of vessel), on which libelant relies are cases where the employee was in complete charge of the safety of the crew and was viewed as the alter-ego of the employer. I have already held that libelant was performing his duties under the direction of the hatch tender and was not, under the facts of this case, responsible for the safety of his crew. Libelant was not a vice-principal and Brady's cases are not in point.

Libelant is entitled to judgment and decree against respondents for the indicated amounts. Respondents are entitled to a judgment of indemnity against Brady. Brady's indemnity action against libelant should be dismissed.

This opinion shall stand as the findings and conclusions. An appropriate decree shall be drafted by counsel for libelant and respondents.