**DOUBARN SHEET METAL, INC., Appellant,**

v.

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL UNION NO. 19, Appellee.**

**No. 76–1319.**

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1976.

Decided Jan. 14, 1977.

---

4. See Appellant's Brief at 16, citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Steven R. Waxman, Bolger & Picker, Philadelphia, Pa., for appellant.

Louis H. Wilderman, Meranze, Katz, Spear & Wilderman, Philadelphia, Pa., for appellee.

David R. Hols, James M. Dawson, Felhaber, Larson, Fenlon & Vogt, St. Paul, Minn, for Sheet Metal and Air-Conditioning Contractors National Association, amicus.

Before STALEY,* HUNTER and GARTH, Circuit Judges.

JAMES HUNTER, III, Circuit Judge:

Doubarn Sheet Metal, Inc., (Doubarn) appeals from a final order of the District Court for the Eastern District of Pennsylvania directing that certain agreements and checks deposited with the court pending the outcome of trial be turned over to Local 19 of the Sheet Metal Workers' International Association (Local 19). The issue on appeal is the district court's interpretation of a labor agreement between Doubarn and Local 75 of the same union. For reasons that follow, we reverse.

## I

Labor relations within the sheet metal contracting industry are elaborately structured, with employer and labor organizations at both the local and national levels. Contractors in given geographical areas form trade associations. These local associations have combined to form the Sheet Metal and Air-Conditioning Contractors National Association (SMACNA). Employees generally belong to locals of the Sheet Metal Workers' International Association (SMWIA). An SMWIA local engages in multi-employer collective bargaining with the local SMACNA chapter.

Employers, however, often perform work outside the geographical jurisdiction of the local unions with which they have entered collective bargaining agreements. In order to avoid any resulting conflicts, SMACNA and SMWIA formed the Joint Labor Relations Adjustment Committee. It comprises members of both organizations and meets periodically to negotiate uniform language for the basic provisions to be inserted in the collective bargaining agreement between each local union and its corresponding SMACNA chapter. These negotiations result in a Standard Form of Union Agreement, which is intended to permit contractors to bid on jobs anywhere in the nation with assurance of uniform labor conditions. The Agreement also guarantees local unions that locally negotiated wages and working conditions will not be undercut by outside employers who import workers from areas where the wages are lower.

To this latter end, the Standard Form of Union Agreement provides that when an employer performs work outside of the local union's geographical jurisdiction, he may send no more than two employees to the

---

job, and those employees must be paid the higher of their local wage scale and the scale at the job location. In all other respects, the employer is to be governed by the working conditions established by the collective bargaining agreement negotiated by the local union that has geographical jurisdiction over the work.

Doubarn is a California sheet metal contractor. Through its local SMACNA chapter, it is signatory to a collective bargaining agreement with Local 75 of the SMWIA. That agreement contains, virtually verbatim, the provisions of the Standard Form of Union Agreement that deal with work outside the geographical jurisdiction of the Local union. Article VIII, Sections 5 and 6 of the agreement read as follows:

"Section 5. When the Employer has any work specified in Article I of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by another Agreement with another union affiliated with the Sheet Metal Workers' International Association, and qualified sheet metal workers are available in such area, he may send no more than two (2) sheet metal workers per job into such area to perform any work which the Employer deems necessary, both of whom shall be from the employer's home jurisdiction. All additional sheet metal workers shall come from the area in which the work is to be performed. *Journeymen sheet metal workers covered by this Agreement who are sent outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Section I of this Article but in no case less than the established wage scale of the local agreement covering the territory in which such work is performed or supervised,* plus all necessary transportation, travel time, board and expenses while employed in that area, and *the Employer shall be otherwise governed by the established working conditions of that local Agreement.* If employees are sent into an area where there is no local Agreement of the Sheet Metal Workers' International Association covering the

area then the minimum conditions of the home local union shall apply.

Section 6. In applying the provisions of Sections 2, 4 and 5 of this Article VIII, the term 'wage scale' shall include the value of all applicable hourly contractual benefits in addition to the hourly wage rate provided in said Section."

(Emphasis added.)

Local 19 of the SMWIA has geographical jurisdiction over sheet metal work in Philadelphia and its vicinity. Local 19 signed a collective bargaining agreement with the Roofing and Sheet Metal Contractors' Association of Philadelphia and Vicinity ("Philadelphia"), the Philadelphia chapter of SMACNA. That agreement contains the provisions of the Standard Form of Union Agreement governing wage scale and working conditions for work performed outside the geographical jurisdiction. But, in addition, it contains one major provision not found in the Standard Form or in the Doubarn-Local 75 agreement. This provision requires employers who are parties to make payments to the Stabilization Agreement of the Sheet Metal Industry Trust Fund (SAS-MI). These payments are made on behalf of each employee and amount to three percent of the employee's hourly gross pay. The SASMI fund is then used to pay benefits to qualifying sheet metal workers who are unemployed because of periodic unemployment in the industry. Workers qualify by working 1200 hours over a twelve month period or 2000 hours over a twenty-four month period in locations where employers are required to make the SASMI contributions.

In April, 1975, Doubarn entered into a contract to perform sheet metal work in the Centre Square Building in Philadelphia. On April 28, two Doubarn employees, members of Local 75, arrived in Philadelphia to perform that work. Before they could begin, representatives of Local 19 demanded that Doubarn make payments to SASMI on behalf of the employees working in Philadelphia. Doubarn refused. Local 19 instructed the two employees to withhold their labor, which they did.

On May 2, 1975, Doubarn brought an action in the district court under section 301(a) of the Labor Management Relations Act,[1] seeking preliminary and permanent injunctions against the work stoppage conducted by Doubarn's employees. On that day, the parties entered into a stipulation: Local 19 would permit Doubarn's employees to return to work, and Doubarn would deposit in court, pending the outcome of the suit, an executed SASMI participation agreement and the estimated amount of the SASMI payments.

On January 8, 1976, the court ordered the agreement and funds turned over to Local 19. It interpreted sections 5 and 6 of the Local 75-Doubarn agreement to mean that SASMI payments were "working conditions" rather than "hourly contractual benefits"; therefore, Doubarn was governed by the local collective bargaining agreement, the Local 19-Philadelphia Agreement, with respect to SASMI payments. Doubarn appeals from that decision.

## II

■ At oral argument, Local 19 for the first time suggested that the district court had no jurisdiction over the subject matter. The Local contends that there is no "contract," as required by section 301(a), between Doubarn and Local 19. We requested further briefing on this point and are satisfied that jurisdiction exists.

In deciding that the "contracts" upon which section 301(a) suits may be brought are not limited to collective bargaining agreements, the Supreme Court noted the need to define "contract" with reference to the demands of labor law:

"Contract in labor law is a term the implication of which must be determined from the connection in which it appears." J. I. Case Co. v. Labor Board, 321 U.S. 332, 334, 64 S.Ct. 576, 579, 88 L.Ed. 762.

It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. Retail Clerks Local 128 v. Lion Dry Goods, Inc., 369 U.S. 17, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503 (1962).

This court adhered to that principle in affirming the district court's decision in Plumbers Local 115 v. Townsend & Bottum, 383 F.Supp. 1339 (W.D.Pa.), aff'd mem., 521 F.2d 1399 (3d Cir. 1975). The district court had assumed jurisdiction despite the fact that the local union and the employer had no written agreement. The "contract" necessary to support jurisdiction under section 301(a) was found in an agreement to which each party had a significant relationship. The employer was a signatory to a National Construction Agreement, which had been negotiated by a labor association of which Local 115 was a member. The district court held that section 301(a) "covers any agreement, written or unwritten, formal or informal, which purports to resolve employment controversies between contractors and unions." 383 F.Supp. at 1343.

In the case sub judice, neither Local 19 nor Doubarn signed the agreement negotiated by their respective national associations, SMWIA and SMACNA. But by incorporating into their respective collective bargaining agreements, pursuant to the intentions of their national associations, the precise terms of the Standard Form provisions covering work by outside contractors, they evidenced an agreement to have those terms govern any relations between them. Cf. Eazor Express, Inc. v. International Brotherhood of Teamsters, 520 F.2d 951, 963 (3d Cir. 1975) (implying no-strike provision in contract that was product of same industry-wide negotiations that had produced other agreements containing such provisions). Indeed, the court below found that the Doubarn-Local 75 collective bargaining

1. Section 301(a), 29 U.S.C. § 185(a), reads as follows:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

agreement is "inextricably interwined with" the Local 19-Philadelphia contract.[2] The intent to create a mechanism for the resolution of disputes between contractors and local unions not parties to the same collective bargaining agreement is further demonstrated by the inclusion in the Doubarn-Local 75 contract and the Local 19-Philadelphia contract of identical procedures for disputes involving outside contractors.[3]

Certainly the parties to this action and their respective national associations believed that they were establishing a system for regulating an employer's activities in areas outside the geographical scope of his particular collective bargaining agreement. Just as certainly, they could not have intended the employer's home local union—here, Local 75—to enforce those regulations. Local 75 would, for example, have no interest in seeing that only two Doubarn employees went to Philadelphia; indeed, its interest would lie precisely in the opposite direction. Therefore, the parties and their national associations, by adopting the provisions in question, must have agreed that they were creating a network for the enforcement of the employer's contractual duties by the local union affected. Otherwise, it would be difficult to explain what those provisions were supposed to mean. That is, if no "contract" exists on this issue, then the sections dealing with outside contractors are nugatory, see *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1131 (3d Cir. 1969) (contract should be interpreted to render its performance possible).

The resulting inference, then, is that Doubarn and Local 19 are parties to an agreement, drawn by their national associations and certified in their local contracts, governing labor relations between outside contractors and local unions. Observance of this agreement obviously would promote industrial peace. It is, therefore, the kind

of agreement that section 301(a) is designed to enforce. *See Lion Dry Goods, supra,* 369 U.S. at 28, 82 S.Ct. 541.

### III

The district court decided that SAS-MI payments were "working conditions." Because Article VIII, Section 5 of the Doubarn-Local 75 contract provides that "working conditions" on jobs outside Local 75's geographical jurisdiction are governed by the other local union's collective bargaining agreement, the court's decision meant that Doubarn was required to make the SASMI payments on behalf of its employees working in Philadelphia. We are as capable as the district court, however, of interpreting the terms of the contract at issue. *See Deering-Milliken & Co. v. Modern-Aire,* 231 F.2d 623, 625 (9th Cir. 1956), 3 A. Corbin, *Contracts* § 554, at 223–25 (1960). After a thorough consideration of the record and the relevant agreements, we find that SAS-MI payments are "hourly benefits." As "hourly benefits," they must be paid only if the entire Local 19 wage package of which they are an element exceeds the wage package of Local 75 members. Because Local 75's wages and hourly benefits exceed those of the Local 19 agreement, we must reverse.

Article VII, Section 5, of the Doubarn-Local 75 contract clearly states that Doubarn employees working on jobs outside the geographical jurisdiction of Local 75 are to be paid the greater of the wage scale under the Doubarn-Local 75 agreement and the established wage scale of the local agreement covering the territory in which the work is performed. Section 6 defines "wage scale" as including "hourly contractual benefits." Section 5 also provides that "otherwise"—i. e., apart from wage scale, including hourly benefits—the employer "shall be governed by the established working conditions of that local Agreement."

---

**2.** Appendix at 176a.

**3.** Article X, § 3, of the Doubarn-Local 75 agreement and Article 12, § 3, of the Local 19-Philadelphia agreement both deal with grievance procedures to be followed by outside contrac-

tors. *See* Appendix at 36a–37a, 110a–111a. Both incorporate the precise language negotiated by SMACNA and SMWIA in the Standard Form of Union Agreement.

To calculate the wages for its employees on the Philadelphia job, Doubarn compared the following wage scales:

| Local 75 | | Local 19 | |
|---|---|---|---|
| Wages/hr. | $10.60 | Wages/hr. | $10.74 |
| Nat'l Pension/hr. | .20 | Welfare/hr. | .52 |
| Local Pension/hr. | 1.35 | Pension/hr. | .50 |
| Welfare Fund/hr. | .84 | Vacation/hr. | .50 |
| | $12.99 | SASMI/hr. | .35 |
| | | | $12.61 |

Determining that Local 75's wage scale was higher, Doubarn paid its employees at that rate.

Local 19 does not deny that SASMI payments, which are fringe benefits calculated on an hourly rate, are "hourly contractual benefits" that enter the wage scale calculus. Local 19 insists, however, that SASMI payments are "working conditions" as well. Because they are also "working conditions," claims Local 19, the SASMI payments called for by the local agreement must be made pursuant to Article VII, Section 5 of the Doubarn-Local 75 contract. (That section declares that the employer is to be governed by working conditions established in the local agreement).

Doubarn resists the claim that SASMI benefits can simultaneously be "hourly contractual benefits"—a component of wages—and "working conditions." Article VIII, Sections 5 and 6 of the Doubarn-Local 75 contract, says Doubarn, dictate that the employer must make the comparison of wage scales—including "hourly contractual benefits"—shown above. "Otherwise," the local working conditions are to be observed. Doubarn contends that the work "otherwise" is an exclusive term indicating that the elements considered in the first determination, wage scale, are not to be considered in the second, working conditions.

We agree. The clear intent of the language in the contested provisions is to separate wage scale items from working conditions. The word "otherwise" cannot be read, as Local 19 would have it, to mean "in addition" or "including some of the former." See Webster's Third New International Dictionary 1598 (1961).

"Wages," "hours," and "working conditions" are not rigidly defined in the law of labor relations, and some aspects of employee benefits, e.g., paid vacation time, fit into any of the three categories. See C. Morris, The Developing Labor Law 390 (1971). In this case, however, the parties have evidenced their intent to establish two separate categories, wages and working conditions, which are to be governed by different contractual provisions. SASMI payments, figured as a percentage of hourly pay and designed to alleviate the employee's economic distress in periods or areas of unemployment, are the type of benefits generally regarded as "wages." See, e.g., Inland Steel Co. v. NLRB, 170 F.2d 247, 250–51 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949). See generally Note, Proper Subjects for Collective Bargaining: Ad Hoc v. Predictive Definitions, 58 Yale L.J. 803 (1949). Local 19 does not controvert this. That being the case, we see no reason to count the SASMI payments against the employer twice, once in the wage scale calculus and again under working conditions. Such double counting would result either in a violation of the Doubarn employees' rights under their collective bargaining agreement, or in a conflict with the rationale of Connell Construction Co. v. Plumbers Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975) (curtailment of employer competition based on efficiency is not a goal of federal labor policy). See The Supreme Court, 1974 Term, 89 Harv.L.Rev. 47, 236 (1975).

Employers of Local 19 sheet metal workers need not go through any wage scale calculus. They merely pay the wages provided in the Local 19 collective bargaining agreement and contribute to the SASMI fund a sum equal to 3% of those wages. But when Doubarn determines its contractual obligations to Local 75 sheet metal workers on the job in Local 19's geographical jurisdiction, it must first go through the wage scale calculus to determine whether the Local 75 wage scale is higher than that of Local 19. After determining that the Local 75 scale is higher than that of Local

19, SASMI payments included. Doubarn pays its Local 75 employees their regular wage and makes the regular pension and welfare payments, pursuant to Art. VIII, § 5 of the Doubarn-Local 75 contract.

When Local 19 then demands SASMI payments, claiming that they are "working conditions," as well as an element of "wage scale," the double counting dangers arise. Although the record is not clear on the point, Local 19 insists that the SASMI payments for members of Local 75 members would be deducted from their negotiated wage rate. Those employees, in effect, would take a three percent pay cut, in direct contravention of their rights under the contract between Doubarn and Local 75. Assuming that Doubarn must make SASMI payments when its employees work in SASMI jurisdictions, those employees would have to spend some thirty working weeks a year in those jurisdictions, away from home, in order to qualify for the possibility of SASMI aid, if they became unemployed. That speculative benefit is no substitute for the receipt of the wage rate guaranteed them under their contract.

If, on the other hand, SASMI payments must be made *in addition* to the full Local 75 wage scale Doubarn owes its workers, then outside contractors like Doubarn face a barrier to performing work in Philadelphia. Even where the contractor's home wage scale is, like Doubarn's, higher than that of the job area, the contractor will have to pay his own employees more than their negotiated wage rate. This requirement could not be considered merely a bulwark against the undercutting of the local wage scale, since the outside workers' scale is already higher. Instead, it would appear to be an extra penalty exacted for sending Doubarn employees to work in another union's bailiwick. This extreme protectionism does not seem to be the purpose of Art. VIII, Sections 5 and 6, of the Doubarn-Local 75 contract. Moreover, it would be suspect under *Connell Construction, supra,* 421 U.S. at 623, 95 S.Ct. 1830, which recognizes that exclusion of competitive contractors, when not necessary to protect union

wages and working conditions, is not a proper goal of federal labor policy.

For the foregoing reasons, the judgment of the district court will be reversed, and the order directing the executed checks and SASMI papers to Local 19 will be vacated.