## RETAIL CLERKS INTERNATIONAL ASSOCIATION, LOCAL UNIONS NOS. 128 AND 633, *v.* LION DRY GOODS, INC., ET AL.

No. 73. Argued January 17, 1962.—Decided February 26, 1962.

*S. G. Lippman* argued the cause for petitioners. With him on the briefs were *Joseph E. Finley* and *Tim L. Bornstein.*

*Merritt W. Green* argued the cause for respondents. With him on the briefs was *Eugene F. Howard.*

Mr. Justice Brennan delivered the opinion of the Court.

Section 301 (a) of the Labor Management Relations Act,[1] provides that "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." The questions presented in this case are: (1) Does the scope of "contracts" within § 301 (a) include the agreement at bar, claimed to be not a "collective bargaining contract" but a "strike settlement agreement"? (2) If otherwise includible, is the "strike settlement agreement" cognizable under § 301 (a), although the petitioners, the labor-organization parties to the agreement, acknowledged that they were not entitled to recognition as exclusive representatives of the employees of the respondents?

The opinions below appear to rest upon alternative holdings, answering in the negative each of these questions. The District Court's conclusion that it lacked jurisdiction over the subject matter, 179 F. Supp. 564, was affirmed in a brief *per curiam* by the Court of Appeals, saying: "The contract here involved is not a collective bargaining agreement between an employer and a labor organization representing its employees. We think that the trial court was correct in reaching the conclusion that collective bargaining contracts between a union and an employer are the only contracts intended to be actionable in a United States District Court under the provisions of section 301 (a)." 286 F. 2d 235. We granted certiorari because of the importance of the questions to the enforce-

---

[1] 61 Stat. 156, 29 U. S. C. § 185 (a).

ment of the national labor policy as expressed in § 301 (a). 366 U. S. 917. We hold that the lower courts erred and remand the cause for trial and further proceedings consistent with this opinion.[2]

The petitioners, local unions of the Retail Clerks International Association, brought this action on the sole jurisdictional basis of § 301 (a) and (b), seeking to compel respondents' compliance with two allegedly binding arbitration awards. Respondents are two department stores in Toledo, Ohio, covered by the Labor Management Relations Act. For some years prior to 1957, petitioners had been the collective bargaining representatives of respondents' employees and had been parties to collective bargaining agreements with respondents. In November 1957, negotiations for renewal contracts ended in impasse. A strike ensued against one of the respondents, Lasalle's, and continued until December 24, 1958; the dispute with the other respondent, Lion Dry Goods, continued during the whole of those 13 months although no strike occurred. On December 24, 1958, the parties ended their dispute with the aid of the Toledo Labor-Management-Citizens' Committee (hereinafter, L–M–C), a local mediation and arbitration body.[3] Negotiations

---

[2] Respondents claim that the cause is moot since, after the commencement of this action, the petitioners merged with Local 954 of the same International Union to form a new Local 954. Petitioners deny mootness and move to add or substitute Local 954 as a party. The facts of the merger make this case indistinguishable from *De Veau* v. *Braisted,* 363 U. S. 144; see also *Labor Board* v. *Insurance Agents' International Union,* 361 U. S. 477. We therefore hold that the case is not moot, and the petitioners' motion to add Local 954 as a party is granted.

[3] Before 1957, the respondents and two other downtown Toledo department stores, through an organization, Retail Associates, Inc., recognized the petitioners as representatives of their employees and executed collective bargaining agreements with the petitioners on a multi-employer basis. When the 1957 impasse developed, the peti-

by means of L–M–C mediation had produced a "Statement of Understanding"[4] satisfactory to all parties.

The Statement contained such key points of settlement as the unions' acknowledgment that they were not then

tioners struck one of those two other stores and it promptly contracted separately with the petitioners. Respondents and the second of the two other stores petitioned the National Labor Relations Board to conduct an election among the employees of the three stores as a single bargaining unit. The petitioners reacted with a demand that each store negotiate separately. Simultaneously, the petitioners called the strike at respondent Lasalle's. The dispute produced considerable litigation. See *Local 128, Retail Clerks* v. *Leedom,* 42 LRR Man. 2031; *Retail Associates, Inc.,* 120 N. L. R. B. 388; *Retail Clerks Assn.* v. *Leedom,* 43 LRR Man. 2004, 2029.

A few days before December 24, 1958, the L–M–C proposed a plan for settling the dispute. Discussions ensued between the Committee and the respondents, and between the Committee and the petitioners. At no time were direct negotiations carried on between petitioners and the respondents. Each side made known to the L–M–C the conditions under which it was willing to resolve the dispute and the L–M–C discussed these conditions with the other side. In this manner a basis for settlement was fashioned which was embodied in the Statement referred to in the text.

[4] The Lasalle's Statement of Understanding (exhibits omitted) reads as follows:

"1. Employees of Lasalle's, who have been absent due to the strike, will be re-instated without discrimination because of any strike activities and without loss of seniority provided they make application for reinstatement in the form and manner provided for by the employer within fifteen days of receipt of notice from the employer.

"2. All such employees who have complied with the provisions of Paragraph 1 above, will be returned to work not later than February 2, 1959, as scheduled by the Company, in their former position classifications if vacant or in positions comparable in duties and earning opportunities.

"3. It is understood that returning strikers will devote their best efforts to their work and to serving the customers of Lasalle's, recognizing that stability of employment depends upon the success of the business.

"4. Lasalle's will warrant to the L–M–C that the Company will not reduce rates of pay presently in effect or withdraw or reduce

entitled to recognition as exclusive representatives, and would not seek such recognition unless and until certified as so entitled in single store unit elections conducted by the National Labor Relations Board, and Lasalle's agree-

---

employee benefit programs currently provided. This assurance includes all improvements offered by the Company through the L–M–C on November 15th, 1957, which are already in effect. No employee will be discriminated against, by reason of Union activities, membership or non-membership. All employees will continue to have job security and no employee will be discharged except for just cause. Wage schedules currently in effect are appended as Exhibit A. Copies of hours and working conditions and other existing benefits, as requested by L–M–C are attached as Exhibit B.

"5. Neither the Company nor the Union will interfere with the employee's right to join or not to join a union, as provided and guaranteed by the Labor-Management-Relations Act. Nothing contained herein is to be construed as giving recognition to the union unless at some future time within the discretion of the union, the union is certified as having been chosen by a majority of employees in a single store unit election conducted by the National Labor Relations Board.

"6. The Union agrees that it will not request bargaining rights unless it proves its right to represent the employees as provided in Paragraph 5 above; nor will the employer recognize any union except upon certification by the N. L. R. B.; nor will the Company file a petition for election unless a claim for representation is made upon the employer. Nothing herein shall preclude an employee representative from entering areas of the store which are open to customers; or from communicating with employees, provided such communication is on the employee's non-working time and in no way interferes with the operating of the business.

"7. Any individual employee who may have a grievance involving an interpretation or application of or arising under the terms of this understanding with the L–M–C, and who has presented such grievance to his supervisor and the Personnel Department without reaching a satisfactory solution, may take his case to the chairman of the L–M–C who in turn shall refer the case to a panel of the L–M–C, whose majority decision and order shall be final and binding. The panel shall render its decision and order within fifteen days after the grievance has been submitted to it. The procedure regulating the

ment to reinstate striking employees without discrimination. Both stores also agreed to continue in effect detailed wage and hour schedules and provisions as to working conditions and other benefits, incorporated as exhibits to the Statement. All terms of employment had been in force prior to December 24, 1958, except an agreement by the stores to provide and pay fully for specified insurance coverage. The stores wrote the L–M–C delivering the Statement, calling it "the basis on which the heretofore existing dispute between [the Locals] and our compan[ies] is to be fully and finally resolved," and specifying that "The conditions to be performed and met by us are, of course, subject to and conditioned upon the receipt by your organization of guarantees from the respective

hearing of the grievance by the L–M–C panel shall be determined by the panel.

"8. The Union will agree that immediately upon receipt of this statement of understanding by the Toledo Labor-Management-Citizens Committee it will cease all picketing, boycotting or other interference with the business of Lasalle's, or R. H. Macy & Co., Inc. wherever located. The Union, the strikers, and the Company shall withdraw forthwith all petitions, unfair labor practice charges and litigation before the National Labor Relations Board and the Courts and further agree not to institute in the future any litigation involving or arising out of the instant dispute. The Union and the Employer shall execute mutually satisfactory releases, releasing and discharging each other, the International Union, the local unions involved, and representatives of the union in their representative or individual capacity, labor papers, and all other labor organizations or their representatives who acted in concert or cooperation in connection with the dispute, from any and all claims, demands, causes of action, of whatever nature or description arising out of the labor dispute, including but not limited to the strikes, picketing, boycotting, and all other activities which may have taken place up to the present date.

"9. This understanding shall become effective in accordance with the letter of transmittal dated December 24, 1958."

The Lion Store's Statement is identical except for the omission of paragraphs 1, 2 and 3.

labor organizations to make the principles enumerated [in the Statement] completely effective." A few days later the Locals wrote the L–M–C that "we herewith agree to the conditions and guarantees of the Statement of Understanding." The conditions to be performed by each side were performed and the dispute was terminated. In a few months, however, new grievances arose, including the two that generated this case. *First.* The unions claimed under the Statement the right of access to the employees' cafeteria in order to communicate with employees during their non-working time. The stores claimed that Statement ¶ 6 gave no right of access to the employees' cafeterias, for those are not "areas of the store which are open to customers." [5] *Second.* Two Lasalle's employees, salesladies in the men's furnishings department, had been fully reinstated except that the saleslady formerly assigned to sell men's shirts was assigned to sell men's sweaters, and the other saleslady, who had been selling sweaters, now was assigned to sell shirts. The Locals submitted these matters to the L–M–C under the procedure of Statement ¶ 7; the stores and the Locals participated fully in the ensuing arbitration proceedings; and the award went to the Locals on both grievances. The stores' refusal to accede to those awards prompted this suit.

The District Court viewed as crucial the question whether the Statement given by the stores to the L–M–C and then concurred in by the Locals, constituted "such a contract as is contemplated by Section 301 (a)." 179 F. Supp., at 567. Although the opinion is somewhat ambiguous, we read it as holding that there was a contract between the Locals and the stores but that only certain kinds of contracts are within the purview of § 301 (a) and

---

[5] The parties' trial stipulation says, *inter alia:* "[T]he employee cafeterias in the downtown stores of the defendants . . . are located in areas in each of the stores not open to customers; . . ."

this was not one of them.[6]  We interpret the District Court as holding that to be within § 301 (a), contracts must be "collective bargaining contracts, or agreements arrived at through collective bargaining," *ibid.;* and fur-

---

[6] The District Court relied for its view of the limited meaning of "contracts" under § 301 (a) upon *Schatte* v. *International Alliance,* 84 F. Supp. 669.  However, that case decided as to § 301 only that the section did not apply to a cause of action which arose before its enactment.  182 F. 2d 158, 164–165.

Apart from the question of its cognizability under § 301 (a), it is clear that the Statement constitutes a contract between the parties. This is so, although they did not negotiate directly but through a mediator, and did not conjoin their signatures on one document.  The record makes obvious that neither the parties nor L–M–C contemplated two independent agreements, one by each side with L–M–C only, unenforceable by either side against the other.

The parties stipulated as to the arbitration proceedings that it was "assumed by all parties in attendance to be a meeting of a panel chosen . . . to perform proper functions delegated to such a panel under the provisions of . . . [the] Statements of Understanding . . . ."  They further stipulated that "nothing . . . [herein] is to preclude the Court from finding that the settlement of December 24, 1958, was a collective bargaining agreement."  In their answer in the District Court, respondents denied "that there is in existence any contract between the plaintiffs, or either of them, and the defendants, or either of them, or that there is in existence any agreement between the parties, collectively or singly, whereby the [L–M–C] is given any right or authority to arbitrate any grievance which the plaintiffs might claim to have."  Petitioners claim and the respondents do not deny that at no time prior to their answer had respondents suggested there was no contract: they complied with the conditions for ending the dispute, they continued following the old wage and hour schedules and other provisions, they participated in the arbitration proceedings and they asked the L–M–C to reconsider their awards on the merits.

Respondents' contention throughout, whether because of the stipulation or otherwise, has been not to negate the existence of any contract at all, but rather to deny that there is a contract of the kind contemplated by § 301 (a).  The District Court so construed the defense, 179 F. Supp., at 565.  The Court of Appeals appears to have

ther, must be with a union that is the recognized majority representative of the employees. The court found that the Statement of Understanding met neither test.[7] The Court of Appeals' brief affirmance, *supra,* fails to make clear whether it agreed with both of those limitations on § 301 (a), or with only one and if so which one.

It is argued that Congress limited § 301 (a) jurisdiction to contracts that are "collective bargaining contracts," meaning, so runs the argument, only agreements concerning wages, hours, and conditions of employment concluded in direct negotiations between employers and unions entitled to recognition as exclusive representatives of employees.

The words of § 301 (a) require no such narrow construction as is suggested; rather, they negate it. *First.* The Section says "contracts" though Congress knew well the phrase "collective bargaining contracts," see, *e. g.,* § 8 (d), § 9 (a), § 201 (c), § 203 (d), § 204 (a)(2), § 211 (a). Had Congress contemplated a restrictive differentiation, we may assume that it would not have eschewed "collective bargaining contracts" unwittingly. Moreover, Congress provided in § 211 (a) : "For the guidance and information of interested representatives of employers, employees, and the general public, the Bureau of Labor Statistics . . . shall maintain a file of copies of all available collective bargaining agreements and other available agreements and actions thereunder settling or adjusting labor disputes." [8] Whatever the proper construction of that Section, insofar as it reflects upon

---

agreed; see *supra.* And at no point in their brief in this Court do respondents argue that no contract exists; they agree that the only issue is jurisdictional.

[7] The court emphasized that the Statement disclaimed the Locals' right to be recognized as exclusive bargaining agent until so certified by the National Labor Relations Board.

[8] 61 Stat. 156, 29 U. S. C. § 181 (a).

§ 301 (a) at all, it supports the inference that "contracts" does include more than "collective bargaining agreements," at least as respondents would define them. *Second.* If "contracts" means only collective bargaining contracts, the subsequent words "or between any such labor organizations" are superfluous, for if there is a collective bargaining agreement between unions it follows that as to that agreement, one union is the employer and the other represents employees. See *Office Employes Union* v. *Labor Board,* 353 U. S. 313. Congress was not indulging in surplusage: A federal forum was provided for actions on other labor contracts besides collective bargaining contracts. See, *e. g., United Textile Workers* v. *Textile Workers Union,* 258 F. 2d 743 (no-raiding agreement). But, it is urged, though Congress meant that labor organizations could sue one another in federal courts on other contracts between themselves, suits between employers and unions were still limited to actions on collective bargaining contracts: The provision for suits between labor organizations was inserted in Conference.[9] Differing House and Senate bills were reconciled in Conference. The House bill spoke of suits involving a violation of "an agreement between an employer and a labor organization or other representative of employees . . . ." The Senate bill read "contracts concluded as the result of collective bargaining between an employer and a labor organization . . . ."[10] It is urged that the Conference compromise upon the word "contracts" reflects a desire to use one word to cover both suits between employers and unions, and suits between unions. But it seems obvious that had Congress intended any limiting differentiation, this would have been accomplished by retaining the Senate bill's phrasing for agreements between employers and

[9] 2 N. L. R. B., Legislative History of the Labor Management Relations Act, 1947, pp. 1535, 1543.

[10] 1, *id.,* at 221, 279.

unions and then providing specifically for the application of the statute to "contracts between any such labor organizations." *Third.* A 1959 enactment, § 8 (f),[11] explicitly contemplates contracts that would not fit respondents' concept of "collective bargaining agreements." It authorizes contracting with unions that represent persons not yet even hired by the employer. Such a contract might cover only hiring procedures and not wages, hours, and conditions of employment. Nothing supports the improbable congressional intent that the federal courts be closed to such contracts.

We find, then, from a reading of the words of § 301 (a), both in isolation and in connection with the statute as a whole, no basis for denying jurisdiction of the action based upon the alleged violation of the "strike settlement agreement."

Furthermore, the statute's purpose would be defeated by excluding such contracts from "contracts" cognizable under § 301 (a). See *Charles Dowd Box Co.* v. *Courtney,* 368 U. S. 502. If this kind of strike settlement were not enforceable under § 301 (a), responsible and stable labor relations would suffer, and the attainment of the labor policy objective of minimizing disruption of interstate commerce would be made more difficult. It is no answer that in a particular case the agreement might be enforceable in state courts: a main goal of § 301 was precisely to end "checkerboard jurisdiction," *Seymour* v. *Schneckloth,* 368 U. S. 351, at 358. See *Charles Dowd Box Co.* v. *Courtney, supra.*

Lastly, legislative history refutes the argument that Congress intended to omit agreements of the kind in suit from "contracts" falling within the purview of § 301 (a).[12]

---

[11] 73 Stat. 545, 29 U. S. C. (Supp. II) § 158 (f).

[12] See 1 and 2 N. L. R. B., *supra,* n. 9, at 94, 151, 221, 279, 297, 336–367, 399–400, 409, 421–424, 436, 475 (see *id.,* at 441), 569–570, 873, 927, 993, 1013, 1014, 1037, 1043, 1044, 1065–1066, 1074, 1076,

We need not decide whether or not this strike settlement agreement is a "collective bargaining agreement" to hold, as we do, that it is a "contract" for purposes of § 301 (a). "Contract in labor law is a term the implications of which must be determined from the connection in which it appears." *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, 334. It is enough that this is clearly an agreement between employers and labor organizations significant to the maintenance of labor peace between them. It came into being as a means satisfactory to both sides for terminating a protracted strike and labor dispute. Its terms affect the working conditions of the employees of both respondents. It effected the end of picketing and resort by the labor organizations to other economic weapons, and restored strikers to their jobs. It resolved a controversy arising out of, and importantly and directly affecting, the employment relationship. Plainly it falls within § 301 (a). "[F]ederal courts should enforce these agreements on behalf of or against labor organizations and . . . industrial peace can be best obtained only in that way." *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, 455.

Only a few words are necessary to dispose of respondents' second contention, that even if this agreement were otherwise within § 301 (a), petitioners' disclaimer of entitlement to recognition as exclusive representatives puts them out of court. This issue does not touch upon whether minority unions may demand that employers enter into particular kinds of contracts or the circumstances under which employers may accord recognition to

1078, 1118, 1123–1124, 1128, 1133, 1145–1146, 1150, 1166, 1208, 1325, 1342–1343, 1446, 1456, 1461, 1483, 1488, 1497, 1524, 1539, 1543, 1557–1558, 1619, 1626, 1654. None of the many references to "collective bargaining contracts" evinces a consideration of the meaning or scope of that phrase.

unions as exclusive bargaining agents. The question is only whether "labor organization representing employees" in § 301 (a) has a meaning different from "labor organization which represents employees" in § 301 (b). In *United States* v. *Ryan,* 350 U. S. 299, we rejected the argument that § 301 (b) was limited to majority representatives. Neither the words, purpose, nor history of the statute suggests any reason for a different construction of the virtually identical words of subsection (a). Nor can "labor organization representing employees" in § 301 (a) be read as differing from "any such labor organizations" in that subsection's very next phrase, and plainly, in suits between labor organizations, their right to recognition as exclusive representatives *vis-à-vis* employers has no relevance whatever.

"Members only" contracts have long been recognized. See, *e. g., Consolidated Edison Co.* v. *Labor Board,* 305 U. S. 197. Had Congress thought that there was any merit in limiting federal jurisdiction to suits on contracts with exclusive bargaining agents, we might have expected Congress explicitly so to provide, for example, by enacting that § 301 (a) should be read with § 9 (a). Compare § 8 (a)(3), § 8 (a)(5), § 8 (b)(3), § 8 (b)(4), § 8 (d). Moreover, § 8 (f), the 1959 amendment considered *supra,* p. 27, contemplates contracting with unions that would not represent a majority. Lastly, if the federal courts' jurisdiction under § 301 (a) required a preliminary determination of the representative status of the labor organization involved, potential conflict with the National Labor Relations Board would be increased, cf. *La Crosse Telephone Corp.* v. *Wisconsin Employment Relations Board,* 336 U. S. 18; *Amazon Cotton Mill Co.* v. *Textile Workers Union,* 167 F. 2d 183, and litigation would be much hindered.

We conclude that the petitioners' action for alleged violation of the strike settlement agreement was cog-

nizable by the District Court under § 301 (a). The judgment of the Court of Appeals is reversed and the cause is remanded to the District Court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE FRANKFURTER, concurring.

I wholly agree with the Court in rejecting the restrictive meaning given by the Court of Appeals to "contracts" in § 301 (a) of the Labor Management Relations Act. I have, however, serious doubt whether the "statement of understanding" on the basis of which the strike was settled was in fact a contract, in the sense of a consensual arrangement between the Retail Clerks and Lion Dry Goods, rather than a formulation of the results of the intercession of a public-spirited intermediary on the basis of which each side was prepared to lay down its arms. However, on a matter of construing a particular document, in light of the surrounding circumstances, I do not desire to dissent.