**CONSTRUCTION AND GENERAL LABORERS UNION, LOCAL NO. 1140, affiliated with International Laborers Union of North America, AFL–CIO, Plaintiff,**

v.

**SHEESLEY–WINTER CONSTRUCTION JOINT VENTURE, Defendant.**

Civ. No. 75–O–52.

United States District Court,
D. Nebraska.

Oct. 22, 1976.

David D. Weinberg, Omaha, Neb., for plaintiff.

Arthur T. Carter, Roger J. Miller, Omaha, Neb., for defendant.

## MEMORANDUM

DENNEY, District Judge.

This matter comes before the Court for decision on the merits subsequent to a plenary evidentiary hearing to the Court and the submission of post-trial briefs.

Plaintiff, Construction and General Laborers Union, Local No. 1140, affiliated with International Laborers Union of North America, AFL–CIO (referred to herein as Local 1140), instituted this action on February 12, 1975, under § 301 of the Labor Management Relations Act of 1947 (hereinafter referred to as the Act), 29 U.S.C. § 185, against defendant, Sheesley-Winter Construction, a joint venture (referred to herein as Sheesley-Winter). Local 1140 claims that Sheesley-Winter's execution of a pension participation agreement on April 24, 1972 and a health, welfare, pension and holiday trust participation agreement on February 16, 1973 binds Sheesley-Winter to collective bargaining agreements entered into by Local 1140 and the Heavy Contractor's Association, Inc. for 1971 to 1974 [Ex. 11] and for 1974 to 1977. Defendant contends that the participation agreement was applicable only to the specific project contemplated at the time of signing the agreement.

In accordance with Rule 52, Fed.R.Civ.P., the Court makes the following findings of facts and conclusions of law.

## FINDINGS OF FACTS

On January 25, 1972, Sheesley-Winter, intending to bid on a construction project in Omaha, Nebraska, met with Jack Budd and Richard Ott, business representatives of Local 1140. Defendant sought information about union wage rates, hiring hall provisions, pension contributions and any other employer obligations involved in performing a job "union" in Omaha.

Sheesley-Winter was awarded the bid on January 26, 1972, and on April 24, 1972, prior to beginning work, Jim Kurtenbach, Sheesley-Winter's job superintendent, signed the pension participation agreement. Subsequently, on February 16, 1973, a second participation agreement was executed by Dennis Machowsky, another Sheesley-Winter superintendent. This second agreement was signed at the request of Local 1140 because the administration of their pension fund had been merged with the health and welfare and holiday trust funds. Its language was identical to that of the first participation agreement except for the inclusion of all three trusts in one agreement.

The participation agreements are standard form agreements drafted by Local 1140 containing a general recitation that the signator agrees to be bound by collective bargaining agreements in effect between Local 1140, the Council Bluffs Contractor's Association, the Heavy Contractor's Association, the Omaha Building Construction Employer's Association, and the Building Construction Employer's Associa-

tion of Lincoln, Nebraska.[1] These agreements impose unilateral obligations on employers to pay pension, health and welfare, and holiday fund contributions at levels specified in collective bargaining agreements between Local 1140 and the various Employer's Associations.

The participation agreement provides in relevant part:

The undersigned employer agrees to be bound by the terms and provisions of collective bargaining agreements entered into between . . . the Heavy Contractors Association, Inc., of Omaha, Nebraska . . . and Construction and General Laborers Union Local # 1140 . . . .

The undersigned employer further agrees to be bound by, and be subject to all amendments, modifications, and changes executed by . . . the Heavy Contractors Association, Inc. . . . and the Construction and General Laborers' Union Local # 1140, executed in the future with respect to contributions to the . . . trust funds.

The participation agreement, on its face, is not limited to any particular building projects nor is a date of termination specified.

Sheesley-Winter completed the Omaha project in June, 1974, and complied in all respects with the participation agreements on the Omaha job and made all pension, health and welfare fund contributions required. Shortly thereafter, defendant was awarded a project in Blair, Nebraska. Work on the Blair project commenced in the fall of 1974 and was completed in the fall of 1975. Union wage rates were not paid, Local 1140's hiring hall was not used and payments were not made into Local 1140's pension, health and welfare and holiday trust funds. Plaintiff seeks enforcement of the participation agreements, an accounting and recovery of money due and owing employees on the Blair project. Defendant contends that by oral agreement of the parties, the participation agreement was limited to the Omaha project.

Carl Sheesley testified that at the meeting on January 25, 1972, prior to bidding on the Omaha project, he specifically asked Jack Budd, plaintiff's business representative, if the participation agreement "would refer just to that job only because that was the only job that we were bidding." [Tr:117:23–118:1]. Budd responded that "that could be done, that they would be happy to work with us." [Tr:118:9–10]. William Winter, a party to the joint venture, and Dale Swanson, an employee of Sheesley-Winter, were present at the meeting and corroborated Sheesley's testimony.

On the next day, Winter testified he met with Budd again. He further testified as follows:

A. We went on basically and discussed the same things that we had discussed the day before, men and wages and availability, plus that he would work with us just on this one job only.

Q. And what was his response?

A. That would be no problem.

[Tr:137:6–11].

Budd disputed the testimony of Sheesley, Winter and Swanson, denying that he said the agreement could be limited to the Omaha project.

An additional issue raised by defendant concerns the fact that the Heavy Contractor's Association Agreement with Local 1140 in existence at the time of the Omaha project was superseded by a new agreement between the Heavy Contractor's Association and Local 1140. Plaintiff contends that the collective bargaining agreement which was to expire on June 30, 1974, was modified. Defendant argues that the agreement expired on June 30, 1974.

## ISSUES

I. Whether pre-hire agreements are enforceable under § 301 of the Act.

II. Whether parol evidence is admissible to limit the participation agreement to the Omaha project.

1. The suit in the instant case concerns only the Heavy Contractor's Association Agreements.

III. Whether the participation agreement expired on June 30, 1974, upon execution of the 1974 to 1977 Heavy Contractor's Agreement.

## CONCLUSIONS OF LAW

Plaintiff is a labor organization representing employees in an industry affecting commerce as defined by the National Labor Relations Act, 29 U.S.C. § 185(a) and defendant is an employer engaged in commerce and in an industry affecting commerce as that term is defined in the Act.

### I.

■ In the building and construction industry,

it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated. . . . One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral.

Sen.Rep.No.187, 86th Cong. 1st Sess., 2344–45, n. 3 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2344.

Congress adopted Section 8(f) of the Act, 29 U.S.C. § 158(f) to validate pre-hire agreements in the construction industry by providing in relevant part:

It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members . .

because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement . . . *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

Local 1140 argues that failure to observe the terms of a pre-hire agreement may predicate an 8(a)(5), 29 U.S.C. § 158(a)(5) violation for refusal to bargain. Sheesley-Winter argues that the legislative history of § 8(f) is void of any indication that it was to be an alternative method of recognizing the majority status of Local 1140. The Sixth Circuit Court of Appeals has held that where a union never attains majority status during the term of a pre-hire agreement, it is not a violation of 8(a)(5) for the employer to refuse to bargain with the union or to repudiate the terms of such an agreement. *N.L.R.B. v. A.A.A. Electric, Inc.,* 472 F.2d 444 (6th Cir. 1973). The District of Columbia Circuit Court of Appeals and Third Circuit Court of Appeals have adopted the opposing view. *N.L.R.B. v. Irvin,* 475 F.2d 1265 (3rd Cir. 1973); *Local No. 150, International Union of Operating Engineers, AFL–CIO v. N.L.R.B.,* 156 U.S.App.D.C. 294, 480 F.2d 1186 (1973).

The Court need not resolve this issue, for, in any event, a breach of a pre-hire agreement may predicate a § 301 lawsuit. The United States Supreme Court held in *Retail Clerks v. Lion Dry Goods,* 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962):

It is argued that Congress limited § 301(a) jurisdiction to contracts that are "collective bargaining contracts," meaning, so runs the argument, only agreements concerning wages, hours, and conditions of employment concluded in direct negotiations between employers and unions entitled to recognition as exclusive representatives of employees.

The words of § 301(a) require no such narrow construction as is suggested; rather, they negate it. *First.* The Sec-

tion says "contracts" though Congress knew well the phrase "collective bargaining contracts," see *e. g.*, § 8(d), § 9(a), § 201(c), § 203(d), § 204(a)(2), § 211(a) . . . . *Second.* If "contracts" means only collective bargaining contracts, the subsequent words "or between any such labor organizations" are superfluous, for if there is a collective bargaining agreement between unions it follows that as to that agreement, one union is the employer and the other represents employees. See *Office Employes Union v. National Labor Relations Board*, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846. . . . . *Third.* A 1959 enactment § 8(f), *explicitly contemplates contracts that would not fit respondents' concept of "collective bargaining agreements."* It authorizes contracting with unions that represent persons not yet even hired by the employer. Such a contract might cover only hiring procedures and not wages, hours, and conditions of employment. *Nothing supports the improbable congressional intent that the federal courts be closed to such contracts.* [Emphasis supplied; footnote omitted]. *Id.* at 25–27, 82 S.Ct. at 546–547.

Accordingly, the Court properly has jurisdiction pursuant to 29 U.S.C. § 185.

## II.

■ The universally accepted rule provides that where a contract is silent as to its duration, evidence of a contemporaneous or prior oral agreement is admissible to show the intended duration of the contract. *See* 4 *Williston on Contracts* § 640 (3rd Ed. 1968); *Restatement of Contracts* § 240 (1932). *See also LaSalle & Koch Co. v. Doyle*, 413 F.2d 345, 349 (6th Cir. 1969). The participation agreement is silent as to duration, and testimony, as set forth in the findings of facts, disclosed an oral understanding that the participation agreement was to expire upon the completion of the Omaha project. Although the testimony of Budd is to the contrary, the Court does not place great weight upon his denials.[2]

■ Accordingly, the Court concludes that parol evidence is admissible to show the intended duration of the participation agreement and that the parties understood that the agreement was to expire upon completion of the Omaha project. It is therefore unnecessary to reach the third issue raised by Sheesley-Winter. Judgment shall be entered for defendant.

---

**2.** Much of Budd's testimony was contradicted by other witnesses. For example, Budd testified as follows:

Q. Have you ever signed a participation agreement with an out-of-state contractor or an in-state contractor where they requested that this apply to a specific project?
A. No, sir, it applies to the whole area?
Q. It applies to the whole area?
A. Yes, sir. [Tr. 36:12–17].

Leonard Schaefer, plaintiff's Business Manager and Financial Secretary, refuted Budd's statement on direct examination:

Q. Now has your Union executed participation agreements similar to Exhibits 7 and 8 that are different than those exhibits and apply to projects only?
A. Yes, sir.
Q. you have executed those?
A. Yes, sir. [Tr. 56:19–57:4]

Schaefer proceeded to discuss participation agreements which applied to specific projects only. Although Schaefer testified that had Sheesley-Winter requested of him project only agreement he would have added a clause to the participation agreement, Sheesley and Winter were apparently unaware of this. They had only limited experience with unions and had never negotiated with a union or signed a union contract.