NATIONAL ASSOCIATION OF LETTER
CARRIERS, AFL–CIO BRANCH
NO. 421

v.

UNITED STATES POSTAL SERVICE.

No. SA–78–CA–114.

United States District Court,
W. D. Texas,
San Antonio Division.

June 5, 1978.

Frank Herrera, Jr., San Antonio, Tex., for plaintiff.

Hal Atkinson (Harold O. Atkinson), Asst. U. S. Atty., San Antonio, Tex., for defendant.

## MEMORANDUM ORDER

SUTTLE, District Judge.

The Plaintiff has brought suit seeking to enforce a settlement agreement reached with the Defendant over a grievance involving the method by which its members compute the time spent taking their coffee or rest breaks. The length of the breaks is also in question. Briefly, the union contends that the settlement constitutes a binding contract that may be judicially enforced without further resort to the arbitration procedures spelled out in its National Contract with the Postal Service. For its part, the Defendant has moved that the action be dismissed for lack of jurisdiction. The Defendant maintains that, since the settlement terms themselves are in dispute, the proper course for the Union is to take its case back through the grievance procedure in order to obtain a clarification of the "agreement"; there is, therefore, no settlement for this court to enforce.

In its original complaint, the Union sought a preliminary injunction to enforce the settlement pending a trial on the merits. Accordingly, the court scheduled a hearing for purposes of considering that request as well as the motion to dismiss. The hearing commenced May 18, 1978;

however, it rapidly became clear that these motions were intimately bound with the merits of the suit and so the court, with the consent of both parties, carried the motion to dismiss and consolidated the hearing with the trial on the merits as permitted by Rule 65(a)(2), F.R.Civ.P. Shortly thereafter the Plaintiff dropped its request for a preliminary injunction and agreed to stand on the merits. The trial itself, sandwiched around criminal matters previously set on the docket, stretched out over a period of two weeks.[1] The matter was then taken under advisement.

The court, having completed its review of the testimony, exhibits, briefs by counsel, and all other relevant material, now finds that this action must be dismissed without prejudice for lack of jurisdiction, the Plaintiff having failed to exhaust its administrative remedies. This decision is based on the following findings of fact and conclusions of law. To the extent that any findings of fact be deemed a conclusion of law, the court expressly adopts it as such; to the extent that any conclusion of law be deemed a finding of fact, the court expressly adopts it as such.

## FINDINGS OF FACT

### A. "The Contracts"

1. On or about July 21, 1975, the National Association of Letter Carriers, AFL–CIO, the national affiliate of the Plaintiff, entered into a collective bargaining agreement with the Defendant ("The National Agreement," Defendant's exhibit # 3) delineating the contractual rights between the parties. This agreement is effective from July 21, 1975, through July 20, 1978.

2. Article V, "Prohibition of Unilateral Action," of the National Agreement provides:

> The Employer will not take any actions affecting wages, hours and other terms and conditions of employment as defined in Section 8(d) of the National Labor Relations Act which violate the terms of this Agreement or are otherwise inconsistent with its obligations under law.

3. Article XXX, "Local Implementation," of the National Agreement provides, in part:

A. Presently effective local memoranda of understanding not inconsistent or in conflict with the 1975 National Agreement shall remain in effect during the term of this Agreement unless changed by mutual agreement pursuant to the local implementation procedure set forth below.

B. There shall be a 30-day period of local implementation to commence October 1, 1975, on the 22 specific items enumerated below, provided that no local memorandum of understanding may be inconsistent with or vary the terms of the 1975 National Agreement:

   1. Additional or longer wash-up periods.

.    .    .    .    .

C. All proposals remaining in dispute may be submitted to final and binding arbitration, with the written authorization of the national Union President. The request for arbitration must be submitted within 10 days of the end of the local implementation period. However, where there is no agreement and the matter is not referred to arbitration, the provisions of the former local memorandum of understanding shall apply, unless inconsistent with or in conflict with the 1975 National Agreement.

D. An alleged violation of the terms of a memorandum of understanding shall be subject to the grievance-arbitration procedure.

4. The National Agreement is silent as to the length of any rest-breaks, coffee-breaks, or wash-ups. The only provision of any possible relevance is found in Article VIII ("Hours of Work"):

---

1. The trial in this case was also consolidated to some extent with a suit against the Postal Service by the American Postal Workers Union, SA–78–CA–115. That case, involving the same attorneys, the same national contract, and a number of the same witnesses as this suit, also revolved around a preliminary injunction to enforce two settlement agreements.

*Section 9. Wash-Up Time.* Installation heads shall grant reasonable wash-up time to those employees who perform dirty work or work with toxic materials. The amount of wash-up time granted each employee shall be subject to the grievance procedure.

5. The grievance-arbitration procedure is outlined in Article XV of the National Agreement, the relevant portions of which provide:

*Section 1. Definition.* A grievance is defined as a dispute, difference, disagreement or complaint between the parties related to . . . conditions of employment . . . [including a complaint] which involves the interpretation, application of, or compliance with the provisions of this Agreement or any local Memorandum of Understanding not in conflict with this Agreement.

*Section 2. Procedure.*

*Step 1*: [The union in a class grievance[2]] must discuss a grievance with [the] immediate supervisor within fourteen (14) days of when [the Union] has learned . . . of its cause . . . The supervisor shall render a decision, stating his reasons, within five (5) days. The Union shall be entitled to appeal an adverse decision to Step 2 of the grievance procedure within ten (10) days after receipt of the Employer's decision. Such appeal shall be in writing to the head of the installation or his designee.

*Step 2A*: The installation head or his designee will meet with the steward or Union representative as expeditiously as possible, but no later than seven (7) days after receipt of the appeal. A decision by the Employer shall be rendered within ten (10) days after it has been appealed to Step 2A. Such decision shall be in writing and the Union shall be entitled to an oral explanation of the reasons therefor. The Union shall be entitled to appeal an adverse decision to Step 3 of the griev-

ance procedure within ten (10) days after receipt of the Employer's decision . . .

*Step 3*: Appeals from decisions rendered at Step 2A shall be made in writing to the *Regional Director for Employee and Labor Relations.*

The employee shall be represented before the regional office by an area or regional Union representative. A decision by the Employer regarding the grievance shall be rendered within fifteen (15) days after it has been appealed to Step 3. Such decision shall be in writing stating the reasons therefor. The Union shall be entitled to appeal an adverse decision to Step 4 (national level) of the grievance procedure within fifteen (15) days after receipt of the Employer's decision.

*Step 4*: The parties shall meet at the national level within fifteen (15) days of such appeal in an attempt to resolve the grievance. Following this meeting, a decision by the Employer will be rendered within fifteen (15) days. Such decision shall be in writing stating the reasons therefor. If the parties are not able to resolve the grievance, the Union shall be entitled to refer the grievance to arbitration within *forty-five* (45) days in accordance with the arbitration procedure. Either the Union or the Employer is entitled to bypass the procedures provided in Steps 3 and 4, or both.

Failure by the Employer to render a decision in any of the Steps of this procedure within the time herein provided for (including mutually agreed-to extension periods) shall be deemed to move the grievance to the next Step of the grievance procedure.

The failure of the aggrieved party or his representative to present the grievance within the prescribed time limits of the Steps of this procedure, including arbitration, shall be considered as a waiver of the grievance.

2. The grievance that ultimately resulted in this suit was clearly a "class grievance" within the meaning of this Agreement.

It is agreed that in the event of a dispute between the Union and the Employer as to the interpretation of this Agreement, such dispute may be initiated as a grievance at the national level without going through the preceding Steps.

*Section 3. Arbitration.* A request for arbitration must be submitted within the time limit for appeal as specified for the appropriate Step. The national President of the Union involved must give written authorization of approval to the Employer at the national level before the request for arbitration is submitted.

. . . . .

6. On or about October 31, 1975, the Plaintiff and the Defendant entered into a Supplemental Local Memorandum of Understanding ("The Local Memorandum," Defendant's exhibit # 4) designed to supplement the National Agreement.

7. The negotiating team representing the Plaintiff in reaching the Local Memorandum included as chief negotiator Frank C. Solis, Jr., the president of the Union and Joe Flores, the vice-president.

8. The preface to the Local Memorandum states that it was entered into "pursuant to the Local Implementation Provision [Article XXX] of the 1975 National Agreement [and] constitutes the entire agreement on matters relating to the local conditions of employment."

9. Article 1, § 3 provides that any existing memorandums of understanding "are superseded by this Memorandum of Understanding."

10. Article XLII, "Local Conditions of Employment," provides in part:

H. Wash-Up Time

. . . . .

*Section 2.* At every station there is some means available in the morning for carriers to have coffee or other refreshment and this is generally allowed prior to or after their casing has been completed or in between the times that they are casing their mail. Then again, upon their return, if they so desire, coffee is available if they wish to have it. This is generally

a unit action and all contribute to the cost of the refreshment. Management feels that this is sufficient breaks for letter carriers during the day since no time limit has been set and it could be up to such time as is necessary to partake of the refreshment. (1972)

11. The table of contents of the Memorandum provides the following note: "[T]he dates in parenthesis denote the year that the particular paragraph was negotiated into the local memorandum of understanding." Thus, the wash-up provision governing coffee was a ratification in the 1975 Local Memorandum of a practice agreed to in 1972. Since the National Agreement left it to the Locals to negotiate wash-up time, provided that the local agreement was not inconsistent with the National Agreement, the court finds that the above provision was a valid agreement binding upon the parties as part of the Local Memorandum. This agreement is silent as to the amount of time allowed for coffee or other refreshments.

### B. "A Chronology"

12. From at least sometime in 1972 until November, 1974, letter carriers were permitted to take as much time as they deemed necessary for their coffee-breaks.

13. The Defendant, management at the San Antonio Post Office, was unhappy with this practice because there was no consistency in the amount of time taken by the carriers as a whole; for example, one carrier might take six minutes, another eighteen, and a third might not take any break at all. Consequently, management wanted to limit the carriers to a five-minute break in the morning and a five-minute break in the afternoon. The carriers, not unsurprisingly, would not agree.

14. On or about November 22, 1974, management issued "Dry Run" instructions to all its carriers pertaining to a forthcoming "inspection" of their routes (Defendant's exhibit # 16). Each route is "inspected" once a year: the carrier is timed; the amount of mail is noted; and each route in turn is then structured to meet the requirement of an 8-hour work day.

15. During inspection each carrier completes a form 1838 (Defendant's exhibit # 1) that details the specifics of his or her route. Line 21 is the "catch-all" provision that incorporates the various times carriers spend on certain miscellaneous activities, including coffee-breaks.

16. The November 22, 1974, instructions informed the carriers that they would be permitted a total of only ten minutes' time on line 21 for their coffee-breaks "pending clarification or ruling to the contrary." The effect of this provision was that in future evaluation of the 8-hour workload only ten minutes would be built into the route for coffee or rest-breaks. Anything over that time would be time spent from, in effect, the carrier's own pocket.

17. The letter carriers filed a grievance over the proposed coffee-break allowances sometime during the final week of November, 1974. The grievance was denied at Step 1 by the supervisors and at Step 2A by John Saldana, the San Antonio Postmaster. An appeal was then taken under Step 3 to the regional level in Memphis, Tennessee, where it was denied by Mr. William Arnold, the management representative for that level. A Step 4 appeal was then taken at the national level in Washington, D.C. This appeal reached Step 4 consideration in February, 1975.

18. During the pendency of the Step 4 appeal, Postmaster Saldana and Union President Solis attempted to negotiate a settlement to the dispute on their own. On or about September 2, 1975, Saldana proposed a ten-minute coffee-break in the morning and an eight-minute coffee-break in the afternoon. Approximately two days later Solis countered an offer of ten minutes in the morning and ten minutes in the afternoon.

19. On September 8, 1975, the Union's executive board went on record that a settlement of anything less than a total of twenty minutes for coffee-breaks would be unacceptable. (Defendant's exhibit # 15A).

20. During the fall months of 1975, a hotly contested election campaign for President of the Plaintiff Union was underway between Solis and Vice-President Flores. A key issue in the campaign was the National Agreement and the Local Memorandum, which was signed during the pendency of the Step 4 appeal and the attendant Solis-Saldana negotiations. (Defendant's exhibits # 12, 13).

21. In November, 1975, Flores won the election; Solis' term in office did not expire, however, until January 10, 1976. Sometime in November, Solis and Saldana reached an oral agreement that the coffee-breaks would be ten minutes in the morning and ten minutes in the afternoon. Further negotiations were required to iron out the precise language to be used.

22. On November 18, 1975, a decision was reached at the Step 4 level. (Defendant's exhibit # 6). That decision, announced by Ms. Frankie Smith of the Labor-Relations Department of the Postal Service, stated:

> In view of the language in the Local Memorandum of Understanding, it has been determined at this level that management should continue the same method as before to compute the coffee-breaks on Form 1839.

Ms. Smith also added the following note for the benefit of management's regional representatives in Memphis:

> NOTE TO REGION: In view of the language in the Local Memorandum of Understanding, the postmaster cannot unilaterally or arbitrarily establish a ten-minute limit on the coffee-breaks. (This is legal advice).

This decision clearly affirms the provision in the Local Memorandum permitting the carriers to take an unspecified amount of time for their coffee-breaks, and invalidates the November, 1974 "Dry Run" instructions.

23. A copy of the Step 4 decision was sent to Mr. Saldana, the Postmaster of the San Antonio Station. That copy was stamped "Received" on November 26, 1975.[3]

3. The quality of this exhibit, which is a copy of the original, is poor. The court notes that the stamp may be dated November 25, 1975.

24. The Step 4 decision notwithstanding, Saldana and Solis continued their negotiations and entered into a written agreement dated December 22, 1975 (Defendant's exhibit # 7). That agreement provides:

1. All letter carriers will be allowed up to ten (10) minutes for coffee in the office in the A.M.

2. Upon their return to the station in the afternoon, they will be allowed up to ten (10) minutes for coffee.

This agreement, obviously, is not one that was "unilaterally or arbitrarily" established.

25. Sometime between December 22, 1975, and February 9, 1976, management issued new "Dry Run" instructions for a route inspection to be conducted the week of February 2–6, 1976. These instructions incorporated the substance of the December 22, 1975, agreement, providing that for purposes of inspection, carriers would be given credit for coffee breaks on line 21 for "[U]p to 10 minutes *office* time in the A.M. and up to 10 minutes *office* time in the P.M."

26. Shortly thereafter, on or about February 26, 1976, the Union filed a second grievance contending that the carriers should be permitted to take an unspecified amount of time for their coffee-breaks (Defendant's exhibit # 10). The core of the disputes stands out in a letter dated March 18, 1976 (Plaintiff's exhibit # 2), sent by President Flores to the Regional Representative in Memphis seeking a Step 3 appeal after the grievance was denied at Steps 1 and 2A:

Reason for appeal: The Union contends that the Coffee Break Memorandum signed by the Postmaster, Mr. J. J. Saldana and Mr. Frank C. Solis, Jr., (enclosure # 1) dated 2–22–75, does not supersede a Step 4 decision (enclosure # 2) rendered on Nov. 18, 1975, by Mr. [sic] Frankie Smith, Labor Relations Department, Washington, D. C.

27. The step 3 appeal was handled during the first week of April, 1976. Mr. T. T. Morris represented the Union and Mr. William Arnold represented management. Both men have the authority to settle grievances at this level, and in the event that a settlement is reached, it is a final decision that is binding on the parties.[4]

28. The initial discussions took place on April 2 and 3 between Arnold and a designate from Morris' office. On April 6, 1976, Arnold and Morris met for the first time over the grievance. On that same day the two men signed the agreement that gave rise to this suit. That document, drafted by Morris provides:

The grievance appeal was resolved by mutual agreement as follows:

Local management will concinue [sic] the same methods as before to compute the coffee-breaks on Form 1838.

(Defendant's exhibit # 8). The document makes absolutely no mention of the thrust of Flores' letter: whether the December 22, 1975, agreement is binding.

29. Postmaster Saldana and former President Solis, hired by management as a labor relations representative on August 14, 1976, both assumed that "before" meant the method they agreed to in December, 1975.[5] President Flores assumed that "before" meant the untimed method that was incorporated into the October, 1975 Local Memorandum. Despite this obvious difference of opinion, the parties continued to abide by the Saldana-Solis agreement until March 31, 1978, when the Plaintiff filed this suit alleging that management unilaterally instituted the practice of two ten-minute coffee-breaks in the face of a Local Memorandum and a binding settlement to the contrary.

### C. "What Does the Decision Mean?"

30. Morris thought he was negotiating solely on the basis of the March 18, 1976,

---

4. Mr. Morris is based in Dallas and handles all grievances arising in Texas and New Mexico stations. His usual procedure is to travel to Memphis every other week and meet with Mr. Arnold. They exchange documents (Morris has only the Union file) and try to reach a settlement.

5. Mr. Solis testified that it is his opinion that "10 and 10" is the past practice and that the grievance settlement did not vitiate his agreement with Saldana.

letter from Flores. In his opinion the Step 4 decision was the operative document and the December 22 agreement was nothing more than "an illegal document." Morris further believed that the Postmaster was acting unilaterally.[6] Yet, although Morris testified that he discussed the December, 1975 agreement with Arnold, he further testified in response to a question whether Arnold agreed with him that the December 1975 agreement was "dead" : "[H]e [Arnold] didn't say."

31. Arnold testified that he did not discuss the April 6, 1976, settlement with Morris before he signed it. Arnold thought that the dispute was narrower than Morris perceived it: Flores' letter might have been the operative document for Morris, but the issue for Arnold was simply to clarify the prior Step 4 decision for the parties. As the man who had been overruled by the Step 4 decision, Arnold was especially cognizant of Ms. Smith's admonishment that no unilateral or arbitrary method could be invoked. Arnold thus did not concern himself with the issue of *whether* the Saldana-Solis agreement *was* a *valid* agreement; he determined that the document, dealing with time rather than method, was simply irrelevant.

32. The court is quite frankly appalled at "negotiations" involved at the Regional level; nevertheless, it has no choice but to find that the Step 3 decision does not resolve the issue of the effect to be given the Saldana-Solis agreement. The court further finds that the Step 3 decision is silent as to whether the parties had the power to enter into an agreement of this nature in light of the 30–day limitation imposed by Article XXX of the National Agreement.[7]

33. The court finds, therefore, that there is no clear agreement capable of enforcement: the construction that should attach to "before," which is *the* crucial word in the Step 3 settlement, totally lacks resolution.

34. The court finds that regardless of whatever import is ultimately placed upon the Saldana-Solis agreement, that particular document is clearly bilateral and not unilateral in nature.

### CONCLUSIONS OF LAW

1. The first two steps in the resolution of this suit are beyond dispute:

   a. Section 1208(b) of the Postal Reorganization Act of 1970, 39 U.S.C. § 1208(b), provides:

      "Suits for violation of contracts between the Postal Service and a labor organization representing Postal Service employees, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount of controversy."

---

6. Morris testified that "they" acted unilaterally. Since Solis was still Union president at the time the agreement was signed, Morris' exact meaning is less than clear. Nevertheless, in view of the obvious tact his testimony pursued, it appears clear that he did believe the action taken was, for whatever reason, unilateral in nature.

7. This case may be primarily distinguished by the fact that the longer it continues, the more questions it raises. An apparently inescapable issue, and one that the court firmly believes is best left for those who negotiated the contract, is the legality of the Saldana-Solis agreement. Article XXX, paragraph B of the National Agreement, provided a thirty-day period during which 22 items were open for local negotiation; included among them was "additional or longer wash-up periods." Although coffee-breaks are usually not thought of as "wash-up time," that is exactly where one finds them in the local memorandum of understanding. A matter of chance? The court thinks not. Thus, there appears to be a negotiated settlement leading to a *shorter* period rather than an additional or a longer one that was clearly in the *process* of implementation during the permissible 30-day span and may have been orally agreed upon within it; the settlement was not actually signed until fifty-two days after the period closed. Is it valid? *That* question is not one that should be foisted upon the courts in the face of an agreement that not only provides for arbitration over alleged violations of the terms of a memorandum of understanding (Art. XXX, paragraph D), but provides, as well, for an expedited grievance at the national level (Article XV, § 2) "in the event of a dispute between the Union and the Employer as to the interpretation of this agreement."

b. Since § 1208(b) tracks the language of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), the court must look to that act for guidance in determining the issue in question here. *National Association of Letter Carriers, AFL–CIO v. Sombrotto*, 449 F.2d 915 (2nd Cir. 1971); *American Postal Workers Union v. United States Postal Service*, 356 F.Supp. 335 (E.D.Tex.1972).

■ 2. And, as the parties and this court are well aware, the function of a court in suits to enforce an arbitration award is extremely limited:

The function of the Court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract.

* * * The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.

*Teamsters Local Unions v. Braswell Motor Freight Lines*, 392 F.2d 1, 7 (5th Cir. 1968), quoting *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).

3. At this juncture, the parties opt for separate paths toward resolution: the Plaintiff insists that the court simply must determine first, whether there was an agreement between the parties that draws its essence from the labor contract, and then, if so, whether it has been abided by; the Defendant maintains that "arbitrator" means that anything less than a decision at arbitration level is something less than is required to invoke the court's jurisdiction to hear those two questions. This court, although in agreement with the view es-

poused by the Defendant, finds that regardless of which path is pursued the ultimate destination is the same: the suit must be dismissed.

4. Both parties have cited the court to numerous cases that they believe support their respective positions. Nevertheless, the one common thread running through each case in which a court has enforced an arbitrator's award is just that: the award or the decision to require arbitration was directly related to a determination reached at the arbitration level. *See* and *compare*, e. g., *Retail Clerks International Association v. Lion Dry Goods, Inc.*, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962); *United Steelworkers of America v. American Manufacturing Co., supra; Boone v. Armstrong Cork Co.*, 384 F.2d 285 (5th Cir. 1967); *United Steelworkers of America v. American International Aluminum*, 334 F.2d 147 (5th Cir. 1964).

■ 5. The issue becomes, then, whether a grievance settlement below the arbitration level is a binding agreement that can be enforced as if it were an arbitrator's decision of the sort that appears in the cases cited in the Plaintiff's "memorandum in opposition to Defendant's motion to dismiss." This court thinks not. Although the case-law is virtually nonexistent on this point, this court finds itself in agreement with the view taken by Judge Singleton in *International Union of Operating Engineers v. Dow Chemical Company*, 348 F.Supp. 1149, 1153 (S.D.Tex.1972):

[The Union] contends that since it once used the grievance procedure to reach the settlement, it should not have to reuse it again. This argument is specious. The Union is correct that once a dispute has been fully arbitrated the Union can go into court to enforce the arbitration award. [Citation omitted]. But here the final step contemplated on the machinery set up in the collective bargaining agreement to settle disputes, arbitration, was not used. Hence, this court should not consider the merits to decide whether the Union is correct in its assertion that the company has breached the settlement

provisions because this dispute over the settlement provisions is in itself arbitrable by the terms of the collective bargaining agreement. If this dispute is arbitrated and one side wishes to enforce the arbitration award, this court has jurisdiction under 301 [Labor Management Relations Act], but this stage has not been reached here.

This view is not especially harsh: as noted in footnote 7, supra, there is an expedited arbitration procedure designed to handle problems of this very nature. Furthermore, as this suit and its companion (SA–78–CA–115) have more than demonstrated, both the number of grievance settlements and the varying interpretations attached to those settlements by the parties involved, arbitration is the only procedure that can resolve these grievances with any degree of efficiency and accuracy. Therefore, the suit must be dismissed without prejudice and the parties should take their dispute to the proper forum as provided in the National Agreement: expedited hearing at the national level and, if necessary, arbitration.[8]

■ 6. Assuming *arguendo* that the Plaintiff is correct in its contention that settlements at the grievance level should receive the same consideration by the courts as settlements reached in arbitration, the result in this case would not vary. As Judge Justice noted in a decision dismissing an action similar to the one here (although including "past practices" rather grievance settlements below the arbitration level), although § 301 applies to § 1208(b) ". . . whether a particular document or combination of circumstances constituted an agreement between the parties must be approached under traditional contract analysis . . ." *American Postal Workers Union v. United States Postal Service, supra* at 337. When traditional contract analysis is used in this case it is clear that there is nothing to enforce: as the extensive findings in this case show, the parties never reached a meeting of the minds, much less a binding agreement. Under the Plaintiff's analysis, then, the case still must be dismissed.

This case is dismissed without prejudice for lack of jurisdiction.

SO ORDERED.

8. The court hopes that the parties will not see this decision as a means to abuse the grievance procedure by contesting every settlement. Even if that were to happen, however, a swifter and surer solution to the problem would still be continued use of arbitration rather than continual litigation.