_____

No. 95-1025
No. 95-1252
_____

United Paperworkers                  *
International Union, AFL-CIO,         *
Local 274; Michael J. Fielder,       *
                                     *
     Plaintiffs - Appellees/         *
     Cross-Appellants,               *
                                     *
                                     *  Appeals from the United States
     v.                              *  District Court for the
                                     *  District of Minnesota.
Champion International               *
Corporation,                         *
                                     *
     Defendant - Appellant/          *
     Cross-Appellee.                 *
                          _____

          Submitted:  October 18, 1995

              Filed:  April 19, 1996
                          _____

Before McMILLIAN, Circuit Judge, WHITE,[*] Associate Justice (Ret.), and
     LOKEN, Circuit Judge.
                          _____

LOKEN, Circuit Judge.


     Champion International Corporation ("Champion") fired employee
Michael J. Fiedler following an incident of sabotage at Champion's pulp and
paper mill in Sartell, Minnesota.  Two months earlier, Champion had
terminated the collective bargaining agreement ("CBA") governing the
Sartell work force.  When fired, Fiedler was president of Local 274 of the
United Paperworkers International Union ("Local 274" or "the Union").
Champion denied his grievance.

_____

     [*]The HONORABLE BYRON R. WHITE, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

With the CBA's arbitration provision abrogated, Fiedler and the Union then commenced this action under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, claiming no good cause for Fiedler's termination. A jury agreed and awarded Fiedler $632,000 in front and back pay. The district court denied Champion's post-trial motions, and Champion appeals, raising a difficult § 301 issue. Fiedler and the Union cross-appeal the denial of reinstatement, punitive damages, and attorneys' fees. Concluding that Champion was prejudiced by an erroneous instruction regarding interim labor agreements, we remand for a new trial.

## I. Factual Background.

This case involves two distinct episodes: the unsuccessful collective bargaining efforts of Champion and the Union in November and December 1989, and the events leading up to Fiedler's termination in February and March 1990. We will summarize the two episodes separately, seeking of course to view all disputed facts in the light most favorable to the jury's verdict.

**A. The CBA Expires.** In March 1989, with a three-year CBA about to expire, the Union notified Champion that it wished to negotiate a new CBA. The existing CBA expired on June 1, with negotiations in progress. The expired agreement remained in effect under a provision that permitted either party to terminate upon ten days notice. Dissatisfied with the on-going negotiations, Champion gave notice it would terminate the CBA on December 1.

Just prior to the December 1 termination date, Champion notified the Union and the Sartell employees that it would unilaterally modify certain terms and conditions of the expired CBA. Of greatest relevance here, Champion abrogated its prior agreement to submit unresolved grievances to binding arbitration. Local 274's President (Fiedler's predecessor) expressed great concern over these unsettling developments. Champion's Human

Resources Manager, Ken Ebert, responded, "Just calm down, you still have a contract, it is just these terms we are pulling out."

Shortly thereafter, Ebert complained to the Union's International Representative, Marv Finendale, that Local 274's leaders were stirring up trouble with Sartell employees, telling them that there was no contract in place. Ebert explained that Champion proposed to post a notice to employees stating that most of the terms of the terminated CBA would remain in effect. Finendale replied, "I could live with that."

Champion posted this notice on December 1. After listing three changes in working conditions, it stated, "All other provisions, including wages and benefits, of the expired Agreement remain intact until further notice." On December 10, again with prior notice to the Union and employees, Champion unilaterally implemented six additional changes to the terms and conditions of the expired CBA. Champion described these changes as "encompassed within the Company's bargaining proposals." None of Champion's unilateral changes affected two sections of the expired CBA that, Fiedler claims, preclude Champion from terminating a member of the bargaining unit without good cause.

Champion and the Union eventually negotiated a new CBA. But that agreement is irrelevant to this lawsuit because it was not effective until November 1990, long after Fiedler's termination.

**B. Fiedler's Termination.** Fiedler worked at the Sartell mill as an assistant power plant operator. Early in the morning of February 15, 1990, an alarm sounded indicating that four disks housed in computers located in the mill's control room had failed. Champion's investigation suggested that the disks had been deliberately erased with a hand-held magnet during a two-minute period when Fiedler was the only employee working in the control room. Fiedler denied tampering with the disks or observing anyone

else do so.  Champion fired Fiedler on March 27, 1990, stating that Fiedler was "the person who was responsible for such damage."

Lacking Champion's agreement to submit the denial of Fiedler's grievance to arbitration, Fiedler and the Union sued in Minnesota state court, alleging wrongful discharge (plus other claims no longer at issue). Champion removed the case to federal court.  During the nine-day trial, Union witnesses testified that they considered Champion's posted notices to constitute an interim "implemented contract."  On the discharge issue, Fiedler presented evidence that many persons had access to the control room, that the failed disks did not interrupt mill operations, that Champion in terminating Fiedler ignored evidence that another employee had been responsible for an earlier disk erasure, and that most members of the mill's management did not believe Fiedler erased the disks.  The jury found that Champion terminated Fiedler without the good cause required under its interim agreement with the Union.  It awarded him $136,980 in back pay and $495,197 in front pay.  The district court granted the Union's motion for prejudgment interest, denied all other post-verdict motions, and this appeal followed.

## II. The Legal Setting.

Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), requires an employer to bargain in good faith with a union representing its employees.  After a CBA has expired, § 8(a)(5) requires that the employer maintain the status quo, that is, the terms of the expired contract, during negotiations for a new agreement.  However, these "are no longer agreed-upon terms; they are terms imposed by law, at least so far as there is no unilateral right to change them."  Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 206 (1991).

Moreover, when the parties have bargained to an impasse, the employer may unilaterally change terms and conditions of employ, so

-4-

long as these changes are consistent with offers that the union has rejected. See NLRB v. Katz, 369 U.S. 736, 743-45 (1962). The federal labor laws protect the use of such economic pressures by both sides to the collective bargaining process. See NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 489 (1960) (NLRB may not outlaw union's post-expiration "Work Without a Contract" program of slow-downs and sit-ins). Of course, the purpose of this economic hurly-burly is to bring the obstinate negotiators back to the bargaining table, somewhat the worse for wear, but without violence or the need for a government-imposed settlement.

Section 301 confers federal jurisdiction over claims "for violation of contracts between an employer and a labor organization representing employees." If there was no such contract between Champion and the Union, then Fiedler's § 301 wrongful discharge claim must be dismissed.[1] After a CBA expires, it cannot provide § 301 jurisdiction for post-expiration claims, and any state law claims that the terms of the expired CBA form an "implied contract" are preempted. See Derrico v. Sheehan Emergency Hosp., 844 F.2d 22, 25-29 (2d Cir. 1988), cited approvingly in Litton, 501 U.S. at 206; Teamsters Local Union 238 v. C.R.S.T., Inc., 795 F.2d 1400, 1404 (8th Cir.) (en banc), cert. denied, 479 U.S. 1007 (1986).

Champion's unilateral implementation of employment conditions after bargaining to an impasse does not, without more, provide a contractual basis for § 301 jurisdiction. See UAW, Local 33 v. R. E. Dietz Co., 996 F.2d 592, 595 (2d Cir. 1993); Chicago Typographical Union No. 16 v. Chicago Sun-Times, Inc., 935 F.2d 1501, 1510 (7th Cir. 1991) ("An implemented final offer is not contractual; it is unilateral"); UMW v. Big Horn Coal Co., 916 F.2d 1499 (10th Cir. 1990), cert. denied, 502 U.S. 1095 (1992).

---

[1]Fiedler did not assert a non-§ 301 claim for breach of an individual employment contract. See Caterpillar Inc. v. Williams, 482 U.S. 386, 393-97 (1987).

Champion's compliance with the terms it has implemented may be enforced, but not under § 301, and not under state law, which is preempted. See Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 102-04 (1962). Rather, non-compliance may be remedied only by the NLRB, as happened in Taft Broadcasting Co. v. NLRB, 441 F.2d 1382 (8th Cir. 1971). See Litton, 501 U.S. at 201.

However, § 301 jurisdiction is not limited to formal CBAs. That statute provides a federal forum for any "agreement between employers and labor organizations significant to the maintenance of labor peace between them." Retail Clerks Int'l Assoc., Local Unions Nos. 128 & 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 28 (1962). When a CBA has been terminated, the parties have bargained to an impasse, and the employer has unilaterally implemented all or part of its final offer, § 301 jurisdiction will lie to enforce any "interim" agreement that the employer and union may reach to preserve labor peace until a new CBA can be negotiated. See United Paperworkers Int'l Union v. International Paper Co., 920 F.2d 852, 859 (11th Cir. 1991); Big Horn Coal, 916 F.2d at 1502; United Paperworkers Int'l Union v. Wells Badger Indus., Inc., 835 F.2d 701, 704-05 (7th Cir. 1987). An employer -- even one like Champion that has declared an impasse and unilaterally implemented new terms and conditions -- may always offer the union an interim agreement on those terms (or others), for example, to head off an impending strike. And the union, or employees authorized to speak for the union, may accept that offer, expressly or by conduct. Thus, a critical question in this case, one upon which § 301 jurisdiction depends, is whether Fiedler and the Union proved that such an interim agreement existed when Fiedler was terminated.

### III. The Jury Instruction Error.

At the instructions conference, the district court heard extensive argument on the interim agreement issue. The court noted that, in December 1989, Champion unilaterally imposed most of the

terms and conditions from the expired CBA, including provisions allegedly requiring good cause to terminate.  Therefore, reasoned the court, Fiedler and other Sartell employees who continued to work had relied upon these terms and, if discharged in violation of them, should have a damage remedy in addition to any unfair labor practice remedy available from the NLRB To fit that remedial construct within the confines of its § 301 jurisdiction to enforce "contracts," the court borrowed a principle from Minnesota employment law -- when an employer offers terms of employment, and employees continue to work, the result is an implied employment contract under state law, which the court considered sufficient to support § 301 jurisdiction and Fiedler's wrongful discharge claim in this case. Cf. Pine River State Bank v. Mettille, 333 N.W.2d 622 (Minn. 1983).  The court implemented that conclusion with the following jury instructions, to which Champion objected:

> To reach a verdict you must determine whether or not the parties had another agreement after the 1986 Collective Bargaining Agreement was terminated . . . .  Such an agreement is not formed merely by an employer's unilateral implementation of terms and conditions of employment.  There must be something more. . . . <u>An interim agreement may be formed when the employer makes a definite offer to maintain in effect certain provisions of the terminated labor contract, and the employees continue to work under the terms of the employer's offer.</u>

(emphasis added).  Champion argues that this instruction infringes the employer's right under federal labor law to impose unilateral conditions of employment after a bargaining impasse.  We agree.

Once the parties have bargained to an impasse, federal law permits them to apply relatively unfettered economic pressure.  The union may call a strike, or institute work slow-downs, as in <u>Insurance Agents</u>.  The employer may lock out its employees, or unilaterally implement terms and conditions it has unsuccessfully proposed.  It mischaracterizes this regime to say that, when the employer imposes unilateral terms and conditions after an impasse,

and the employees continue to work, a § 301 contract has been formed. Every employment relationship is essentially contractual, but this type of post-impasse relationship is not a *§ 301 contract* between employer and union -- their impasse is the antithesis of a contract. See <u>International Union, UAW v. Atlas Tack Corp.</u>, 590 F.2d 384, 386 (1st Cir. 1979). Moreover, to superimpose a fictional § 301 contract over the employer's unilateral implementation of new terms and conditions, simply because the employees responded by working instead of striking, dramatically lessens the employer's leverage. That may or may not be wise as a matter of labor policy, but changes in labor policy are for Congress to make.

Thus, we conclude that proof of an interim agreement requires not only evidence of the employer's intent to make an offer, but also evidence of the union's intent to accept that offer over and above the fact that union members continued to work. Unilaterally implemented terms may form the basis of an interim agreement. The employer may make such an offer, for example, because the union has threatened economic reprisal. The union may accept the proposal because it wishes to avoid a strike or lockout while attempting to bargain out of the impasse. And because an interim agreement is by definition informal, the union's acceptance need not be formal or even express. See <u>United Paperworkers</u>, 920 F.2d at 857 (union advised it would not strike without giving ten days notice). But the evidence of offer and acceptance must relate to the union-employer bargaining relationship to prove that a § 301 contract was formed. Thus, the fact that the employer announced unilateral changes is not sufficient evidence of an interim agreement offer. And the fact that the employees continued to work is not sufficient evidence of union intent to accept an offered interim agreement. See <u>Big Horn Coal</u>, 916 F.2d at 1502 (no interim agreement when

union members continued to work under imposed terms for three months and then struck for seven months).[2]

For the foregoing reasons, we conclude that the jury was not properly instructed on the requisites of a § 301 interim agreement between Champion and the Union. Because this issue was critical to both the district court's jurisdiction and the merits of Fiedler's claim, there must be a new trial. See Walker v. AT & T Technologies, 995 F.2d 846, 849 (8th Cir. 1993).

### IV. Other Issues.

**A.** Champion argues that we should order judgment as a matter of law in its favor because there was insufficient evidence of an interim agreement between Champion and the Union that would support Fiedler's § 301 claim for wrongful discharge. Though the case for an interim agreement is perhaps thin, there is some evidence that Champion formalized its unilateral implementation in an offer of an interim agreement to lessen employee unrest and avoid a strike, and that the Union chose to accept that offer rather than taking more hostile action. Bearing in mind the strict standard of review for this issue, see Smith v. World Ins. Co., 38 F.3d 1456, 1460 (8th Cir. 1994), and recognizing that courts may legitimately "stretch" to find interim agreements because such agreements further the

---

[2]At oral argument, the Union relied heavily on the recent case of Luden's Inc. v. Local Union No. 6, Bakery Workers' Int'l Union, 28 F.3d 347 (3d Cir. 1994). But we conclude that Luden's, and the earlier case of International Bhd. of Boilermakers v. Transue & Williams Corp., 879 F.2d 1388 (6th Cir. 1989), are distinguishable because in those cases interim agreements were implied after a CBA terminated but both parties continued to act consistently with all of its terms and conditions. On the other hand, when one party unilaterally changes or repudiates the terms of a terminated CBA, as in this case, more affirmative evidence is required to prove intent to enter into an enforceable § 301 interim agreement.

federal policy of labor peace,[3] we conclude that a properly-instructed jury could have found a terminable-at-will interim agreement to keep in place Champion's unilaterally implemented terms and conditions of employ.

**B.** We also reject Champion's two other arguments for judgment as a matter of law -- that there was insufficient evidence of a good cause contract provision, and that Champion had good cause to fire Fiedler. As to the first, although Fiedler relies on CBA provisions that do not use the term "good cause," the evidence strongly supports the Union's claim that good cause was an essential term of the expired CBA, and therefore of any interim agreement. As to the second, whether Champion had good cause was hotly contested at trial, with powerful evidence on both sides. We will not disturb the jury's resolution of that issue.

**C.** We likewise reject the Union's contention that the district court erred by refusing to instruct the jury on punitive damages. We are inclined to the view that punitive damages may not be awarded in a § 301 breach-of-contract case. Cf. Local 60, United Bhd. of Carpenters & Joiners v. NLRB, 365 U.S. 651, 655 (1961) (NLRB powers are "remedial, not punitive"). But in any event, we agree with the district court that Champion's conduct was nowhere near so outrageous or extraordinary as to warrant an instruction on punitive damages. As the court explained:

> Although the jury has found that the defendant did not have good cause to terminate Fiedler, it was clear from the evidence that defendant Champion had what it believed to be a justifiable reason for taking its actions.

---

[3]Examples of this judicial predilection include Local 74, Service Employees Int'l Union v. Ecclesiastical Maintenance Servs., Inc., 55 F.3d 105, 108-09 (2d Cir. 1995), and Wells Badger, 835 F.2d at 704-05. In our view, it can properly be taken into account in reviewing a jury verdict that an interim agreement was formed.

Cf. Butler v. Local Union 823, Int'l Bhd. of Teamsters, 514 F.2d 442, 454 (8th Cir.), cert. denied, 423 U.S. 924 (1975). For the same reason, we conclude the district court did not abuse its discretion in denying the Union's request for attorney's fees on account of Champion's alleged bad faith. See Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y, 421 U.S. 240, 258-59 (1975).

**D.** There are two remaining, interrelated issues -- the Union's contention that the district court should have ordered Fiedler's reinstatement, and Champion's claim that the court's alternative remedy of $495,000 in front pay was excessive. They warrant more extensive comment because of the need for a new trial.

The equitable remedy of reinstatement is left to the district court's discretion. Tatum v. Frisco Transp. Co., 626 F.2d 55, 60 (8th Cir. 1980). Here, the court found that the relationship between Fiedler and Champion was acrimonious and that Champion had presented a legitimate and substantial business justification for opposing reinstatement. Substantial hostility, above that normally incident to litigation, is a sound basis for denying reinstatement. See Brooks v. Woodline Motor Freight, Inc., 852 F.2d 1061, 1066 (8th Cir. 1988). Moreover, the Union failed to prove that Fiedler was fired because of Union activities, so reinstatement was not needed to avoid a chilling effect on other union members. We conclude that the district court did not abuse its discretion in denying Fiedler's claim for reinstatement. However, the passage of time may soften the most acrimonious of relationships, and the discretion to reinstate must be exercised on a specific trial record. Thus, the reinstatement issue is not foreclosed on remand.

An equitable award of front pay is generally appropriate when reinstatement must be denied. Williams v. Valentec Kisco, Inc., 964 F.2d 723, 730 (8th Cir.), cert. denied, 506 U.S. 1014 (1992). In this case, Fiedler was awarded front pay for twenty-four years, until he reaches retirement age. An award of front pay until

retirement ignores the plaintiff's duty to mitigate damages and the district court's corresponding obligation to estimate the financial impact of future mitigation.  See Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1258 (2d Cir. 1987).  Instead of warranting a lifetime of front pay, Fiedler's relatively young age should improve his future opportunities to mitigate through other employment.

Moreover, the Union cites no authority for an award of twenty- four years of front pay, whereas a number of cases have rejected far shorter awards as improperly speculative.  See Hybert v. Hearst Corp., 900 F.2d 1050, 1056-57 (7th Cir. 1990) (five years was too speculative); Goss v. Exxon Office Sys. Co., 747 F.2d 885, 890 (3d Cir. 1984) (affirming four months of front pay because a longer period would be speculative); Snow v. Pillsbury Co., 650 F. Supp. 299, 300 (D. Minn. 1986) (nine-year award reduced to three years).  For these reasons, although we need not decide the issue because of the need for a new trial, we express grave doubt that an award of $495,000 in front pay could be upheld.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for a new trial.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-